IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KATHERINE BLUMMER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:09-CV-00326 |
| | § | |
| UNITED SPACE ALLIANCE, LLC, | § | |
| | § | |
| Defendant. | § | |

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

---

LUCIA ROMANO OSTROM
Attorney in Charge
Texas Bar No. 24033013
Southern Dist. of Texas No.  690123
Advocacy, Inc.
1500 McGowen, Ste. 100
Houston, Texas 77004
(713) 974-7691 Phone
(713) 974-7695 Fax

BRIAN EAST
Texas Bar No. 06360800
Advocacy, Inc.
7800 Shoal Creek Blvd., Ste. 171E
Austin, Texas 78757
(512) 454-4816 Phone
(512) 454-3999 Fax


ATTORNEYS FOR PLAINTIFF

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES .................................................................. iv

I.  INTRODUCTION ........................................................................ 1

II.  STATEMENT OF FACTS ............................................................ 3

    A.  Plaintiff's Disability ............................................................ 4

    B.  Plaintiff's Job Duties .......................................................... 4

    C.  The Quality of Plaintiff's Work Was Not the Issue ................... 5

    D.  Defendant's Little-Understood, Disconnected, and Bizarre
        Accommodation System ...................................................... 5

    E.  Flare-Up of Plaintiff's Disability .......................................... 12

    F.  Plaintiff's Request for Accommodations and Attempts
        to Negotiate Defendant's Crazy-Quilt Bureaucracy ................ 13

III.  SUMMARY OF ARGUMENT ..................................................... 50

IV.  ARGUMENT AND AUTHORITIES ............................................. 51

    A.  Summary Judgment Standard ............................................... 51

    B.  The *McDonnell Douglas* Burden-Shifting Formula
        Does Not Apply To Plaintiff's Failure-To-Accommodate
        Claims ............................................................................. 52

    C.  The True Elements of an ADA Failure-To-
        Accommodate Claim .......................................................... 58

    D.  The Burdens of Proof in a Failure-to-Accommodate
        Claim .............................................................................. 61

    E.  Analysis in Similar Cases .................................................... 61

    F.  Defendant Is Not Entitled To Summary Judgment On
        Disability ......................................................................... 63

1. Plaintiff's Evidence of Disability ....................................................64

    a. Proof of Impairment...................................................................64

    b. Proving a Substantial Limitation ...............................................64

    c. Plaintiff's Substantial Limitation in Walking...........................65

    d. Plaintiff's Substantial Limitation in Lifting ............................65

    e. Plaintiff's Substantial Limitation in Standing .........................66

    f. Plaintiff's Substantial Limitation in Pushing...........................66

    g. Plaintiff's Substantial Limitation in Running...........................66

    h. Plaintiff's Substantial Limitation in Working .........................67

2. Errors and Inadequacy in Defendant's Arguments About Disability................................................................................67

G. Defendant is not entitled to Summary Judgment on "Qualified"...................................................................................73

    1. Essential Job Functions...............................................................73

    2. Essential Job Functions are a Fact-Intensive Inquiry....................................................................................74

    3. Reasonable Accommodation .......................................................78

        a. Flexible Schedule ..................................................................79

        b. Teleworking .........................................................................81

    4. Flexible Interactive Process.........................................................83

V. CONCLUSION .....................................................................................90

CERTIFICATE OF SERVICE ...........................................................................92

# TABLE OF AUTHORITIES

## CASES

*Aka v. Washington Hosp. Center*, 156 F.3d 1284 (D.C. Cir. 1998) ........................52

*Anderson v. Liberty Lobby, Inc.* 477 U.S. 144 (1970)..............................................51

*Armstrong v. Burdette Tomlin Memorial Hosp.*, 438 F.3d 240 (3d Cir. 2006).......60

*Barber v. Nabors Drilling U.S.A., Inc.* 130 F. 3d 702 (5th Cir. 1997)...................74

*Barnett v. U.S. Air, Inc.*, 228 F.3d 1105 (9th Cir. 2000) ...................................79, 90

*Bartee v. Michelin North America, Inc.*, 374 F.3d 906 (10th Cir. 2004) ...............60

*Bates v. United Parcel Service, Inc.*, 511 F.3d 974 (9th Cir. 2007) .......................75

*Battle v. United Parcel Service, Inc.*, 438 F.3d 856 (8th Cir. 2006) ......................90

*Belk v. Southwestern Bell Telephone Co.*, 194 F.3d 946 (8th Cir. 1999)..........71, 72

*Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448 (5th Cir. 2005) ...........55

*Blockel v. J.C. Penney Co., Inc.*, 337 F.3d 17 (1st Cir. 2003)..........................75, 76

*Borkowski v. Valley Central School Dist.*, 63 F.3d 131 (2d Cir. 1995)..................79

*Boyar v. YMCA of Norwalk, Inc.*
    2008 WL 1743496 (D. Conn. April 15, 2008) ......................................69, 70

*Breen v. Dept. of Transp.*, 282 F.3d 839 (D.C. Cir. 2002) .....................................78

*Bultemeyer v. Fort Wayne Community Schools*,
    100 F.3d 1281 (7th Cir. 1996) ........................................................52, 54, 88

*Carlson v. Inacom Corp.*, 885 F. Supp. 1314 (D. Neb. 1995)................................78

*Carter v. Northwest Airlines, Inc.*
    2003 WL 403131 (N.D. Ill. Feb. 20, 2003)..................................................72

*Cato v. First Federal Community Bank*
    2009 WL 3733358 (E.D. Tex. Nov. 5, 2009)................................................59

*Cehrs v. Northeast Ohio Alzheimer's Research Center*
    155 F.3d 775 (6th Cir. 1998) ........................................................ 88

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................... 51

*Criado v. IBM Corp.*, 145 F.3d 437 (1st Cir. 1998) ............................... 88

*Dadian v. Village of Wilmette*, 269 F.3d 831 (7th Cir. 2001) ................. 70

*Daugherty v. City of El Paso*, 56 F.3d 695 (5th Cir. 1995) ..................... 53

*Davidson v. America Online, Inc.*, 337 F.3d 1179 (10th Cir. 2003) ......... 52, 54

*Davis v. Guardian Life Ins. Co. of Am.*
    2000 WL 1848596 (E.D. Pa. Dec. 15, 2000) ................................ 82

*Desmond v. Mukasey*, 530 F.3d 944 (D.C. Cir. 2008) ........................... 70

*E.E.O.C. v. AIC Sec. Investigation, Ltd.*, 820 F. Supp. 1060 (N.D. Ill. 1993) ........ 82

*E.E.O.C. v. Chevron Phillips Chemical Co., LP*
    570 F.3d 606 (5th Cir. 2009) ................................... 64, 65, 68, 71, 72, 86, 89

*E.E.O.C. v. Convergys Customer Management Group, Inc.*
    491 F.3d 790 (8th Cir. 2007) ........................................................ 70

*E.E.O.C. v. E.I. Du Pont de Nemours & Co.*
    480 F.3d 724 (5th Cir. 2007) .................................................. 65, 76

*E.E.O.C. v. Houston Area Sheet Metal Joint Apprenticeship Committee*
    2002 WL 1263893 (S.D. Tex. May 31, 2002) .............................. 56

*E.E.O.C. v. R.J. Gallagher Co.*, 181 F.3d 645 (5th Cir. 1999) ................ 67

*E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789 (7th Cir. 2005) .......... 90

*Ekstrand v. School Dist. of Somerset*, 583 F.3d 972 (7th Cir. 2009) ...... 60

*Emory v. AstraZeneca Pharmaceuticals LP*
    401 F.3d 174 (3d Cir. 2005) ................................................... 68, 71

*Enica v. Principi*, 544 F.3d 328 (1st Cir. 2008) ...................................... 60

*Evans v. City of Bishop*, 283 F.3d 586 (5th Cir. 200) ............................. 52

*Fenney v. Dakota, Minnesota & Eastern R. Co.*, 327 F.3d 707 (8th Cir. 2003) .....52

*Fields v. St. Bernard Parish School Bd.*
2000 WL 335744 (E.D. La. March 30, 2000) ...............................60

*Finical v. Collections Unlimited, Inc.*, 65 F. Supp. 2d 1032 (D. Ariz. 1999) .........73

*Fontanilla v. City and County of San Francisco*
2001 WL 513395 (N.D. Cal. Feb. 28, 2001)................................54

*Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638 (1st Cir. 2000)..............77

*Gary v. Combined Group Ins. Services, Inc.*
2009 WL 2868485 (N.D. Tex. Sept. 4, 2009) ...............................59

*Gibson v. Lafayette Manor, Inc.*
2007 WL 951473 (W.D. Pa. March 27, 2007) ...............................88

*Giles v. General Elec. Co.*, 245 F.3d 474 (5th Cir. 2001) ......................76

*Gillen v. Fallon Ambulance Service, Inc.*, 283 F.3d 11 (1st Cir. 2002) .................72

*Gonzales v. Columbia Hosp.*, 2002 WL 31245379 (N.D. Tex. Oct. 1, 2002).........70

*Grace v. Potter*, 2006 WL 1207735 (S.D. Tex. May 3, 2006)...............................56

*Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181 (2d Cir. 2006)....................53, 60

*Hansen v. Continental Ins. Co.*, 940 F.2d 971 (5th Cir. 1991)...............................51

*Hartup v. American Standard, Inc.*
2009 WL 2776386 (N.D. Tex. Aug. 31, 2009) ......................................59, 60

*Hasty v. Integra Bank Corp.*, 2004 WL 3315373 (S.D. Ind. Nov. 23, 2004)..........80

*Hebert v. Monsanto Co.*, 682 F.2d 1111 (5th Cir. 1982)........................................56

*Hernandez v. City of Hartford*, 959 F. Supp. 125 (D. Conn. 1997) .......................82

*Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252 (1st Cir. 1999)............52

*Holly v. Clairson Industries, L.L.C.*
492 F.3d 1247 (11th Cir. 2007) ...................................... 52, 61, 62, 75, 77, 78

*Humphrey v. Memorial Hospitals Ass'n,* 239 F.3d 1128 (9th Cir. 2001)...............81

*Hypes v. First Commerce Corp.*, 134 F.3d 721 (5th Cir. 1998) ............................77

*Jenkins v. Cleco Power, LLC*, 487 F.3d 309 (5th Cir. 2007) ...........................58, 65

*Jimenez v. DynCorp Intern., LLC*, 635 F. Supp. 2d 592 (W.D. Tex. 2009)............56

*Joffer v. Premier Bankcard Inc.*, 2008 WL 2371149 (D.S.D. 2008) .....................68

*Johnson v. Evangelical Lutheran Good Samaritan Society*
2005 WL 2030834 (D. Or. Aug. 23, 2005) ....................................................53

*Langon v. HHS*, 959 F.2d 1053 (D.C. Cir. 1992) ....................................................81

*Lawson v. CSX Transp., Inc.*, 245 F.3d 916 (7th Cir. 2001) .................................70

*LeBlanc v. Lamar State College*, 232 S.W.3d 294
(Tex.App.–Beaumont 2007, no writ) ..........................................................58

*Leffel v. Valley Financial Services*, 113 F.3d 787 (7th Cir. 1997) ........................57

*Lehman v. U.S. Steel Corp.*, 2007 WL 2728659 (W.D. Pa. Sept. 17, 2007)...........72

*Little v. Texas Dept. of Criminal Justice*, 148 S.W.3d 374 (Tex. 2004) ................72

*Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731 (5th Cir. 1999)................................90

*Mark v. Burke Rehab. Hosp.*
1997 WL 189124 (S.D.N.Y. April 17, 1997)................................................80

*Matczak v. Frankford Candy and Chocolate Co.*
136 F.3d 933 (3d Cir. 1997) .......................................................................57

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .............51

*McAlindin v. County of San Diego*, 192 F.3d 1226 (9th Cir. 1999) .......................88

*McCoy v. Texas Dept. of Criminal Justice*
2006 WL 2331055 (S.D. Tex. Aug. 9, 2006)................................................79

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).............................passim

*McInnis v. Alamo Community College Dist.*
207 F.3d 276 (5th Cir. 2000) .................................................................65, 68

*Miles-Hickman v. David Powers Homes, Inc.*
  589 F. Supp. 2d 849 (S.D. Tex. 2008) ........................................................58

*Monette v. Electronic Data Systems Corp.*
  90 F.3d 1173 (6th Cir. 1996) ........................................................52, 53, 54

*Monterroso v. Sullivan & Cromwell, LLP*
  591 F. Supp. 2d 567 (S.D.N.Y. 2008) ........................................................86

*Nighswander v. Henderson*, 172 F. Supp. 2d 951 (N.D. Ohio 2001) .....................60

*Niimi-Montalbo v. White*, 243 F. Supp. 2d 1109 (D. Haw. 2003) ..........................82

*Norden v. Samper*, 503 F. Supp. 2d 130 (D.D.C. 2007) .........................................80

*Peebles v. Potter*, 354 F.3d 761 (8th Cir. 2004) ....................................................54

*Penny v. United Parcel Service*, 128 F.3d 408 (6th Cir. 1997) ..............................60

*Picinich v. United Parcel Service*, 321 F. Supp. 2d 485 (N.D.N.Y. 2004) .......88, 89

*Prewitt v. U.S. Postal Service*, 662 F.2d 292 (5th Cir. 1981) ...........................55, 61

*Price v. Marathon Cheese Corp.*, 119 F.3d 330 (5th Cir. 1997) ...........................56

*Reza v. IGT*, 2008 WL 2048357 (D. Nev. May 12, 2008) ......................................53

*Rhoads v. F.D.I.C.*, 257 F.3d 373 (4th Cir. 2001) ................................................60

*Riel v. Electronic Data Systems Corp.*
  99 F.3d 678 (5th Cir. 1996) ........................................................58, 61, 73, 74

*Rizzo v. Children's World Learning Centers, Inc.*
  84 F.3d 758 (5th Cir. 1996) ........................................................................55

*Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468 (5th Cir. 2006).........68

*Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755 (5th Cir. 1996) .........76, 77, 78

*Rohr v. Salt River Project Agricultural Imp. and Power Dist.*
  555 F.3d 850 (9th Cir. 2009) ......................................................................75

*Sargent v. Litton Systems, Inc.*, 841 F. Supp. 956 (N.D. Cal. 1994) ......................82

*Shannon v. City of Philadelphia*, 1999 WL 1065210 (E.D. Pa. 1999)....................89

*Street v. Ingalls Memorial Hosp*., 2008 WL 162761 (N.D. Ill. Jan. 17, 2008) .......68

*Sutton v. United Airlines, Inc.*, 527 U.S. 471 (1999) ................................64

*Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002)................................56

*Taylor v. Phoenixville School Dis*t., 184 F.3d 296 (3d Cir. 1999) ...................88, 90

*Taylor v. Rice*, 451 F.3d 898 (D.C. Cir. 2006) ........................................75

*Taylor v. The Principal Financial Group, Inc*.
      93 F.3d 155 (5th Cir. 1996) .........................................................69, 83, 84

*Teahan v. Metro-North Commuter R. Co*., 951 F.2d 511 (2d Cir. 1991)...............53

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981) .....................53

*U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002)....................................57, 61, 79

*Vaughn v. Federal Exp. Corp*., 1997 WL 625495 (E.D. La. Oct. 7, 1997)............76

*Walton v. Mental Health Ass'n of Southeastern Pennsylvania*
      168 F.3d 661 (3d Cir. 1999) ........................................................52

*Ward v. Massachusetts Health Research Institute, Inc*.
      209 F.3d 29 (1st Cir. 2000)........................................................78, 79

*Welther v. Bowen*, 1987 WL 13975 (N.D. Ill. July 15, 1987) ................................70

*Williams v. Avnet, Inc*., 520 U.S. 1240 (1997) ..................................52, 54

*Williams v. Channel Master Satellite Systems, Inc*.
      101 F.3d 346 (4th Cir. 1996) ......................................................52, 54

## STATUTES AND RULES

42 U.S.C. §§12101 *et seq*. ("ADA")...........................................................1

42 U.S.C. § 12102(1)(A)..................................................................64

42 U.S.C. § 12111(8) ......................................................................73

42 U.S.C. § 12111(9)(B)..................................................................79

42 U.S.C. § 12112(b)(5)(A) .................................................................58, 79

42 U.S.C. § 12117(b) ...............................................................................53

42 U.S.C. § 12201(a) ...............................................................................53

29 C.F.R. § 1630.2(h) ..............................................................................65

29 C.F.R. § 1630.2(i) ...............................................................................65

29 C.F.R. § 1630.2(j)(1)(ii) ......................................................................65

29 C.F.R. § 1630.2(j)(2) ...........................................................................65

29 C.F.R. § 1630.2(j)(3)(i) ........................................................................67

29 C.F.R. § 1630.2(j)(3)(ii) .......................................................................67

29 C.F.R. § 1630.2(n)(1) ....................................................................73, 74

29 C.F.R. § 1630.2(n)(2) ....................................................................74, 75

29 C.F.R. § 1630.2(n)(3) ....................................................................74, 75

29 C.F.R. § 1630.2(o) ...............................................................................77

29 C.F.R. § 1630.9 ...................................................................................83

Tex. Lab. Code §§ 21.001 *et seq.* ............................................................1

Tex. Lab. Code § 21.128(a) ......................................................................58

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KATHERINE BLUMMER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:09-CV-00326 |
| | § | |
| UNITED SPACE ALLIANCE, LLC, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Plaintiff Ms. Katherine Blummer submits this Response in Opposition to Defendant's Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil procedure and would show the Court as follows:

## I. INTRODUCTION

This is an employment discrimination case under Title I of the Americans with Disabilities Act, 42 U.S.C. §§12101 *et seq.* ("ADA") and Chapter 21 of the Texas Labor Code, §§21.001 *et seq.* ("Chapter 21"). The summary judgment evidence set out below shows that:

(1) Ms. Blummer has Polyostotic Fibrous Dysplasia, a serious and incurable bone disease resulting from McCune-Albright Syndrome, which causes her repeated fractures and severe pain, prevents her from walking beyond the shortest distances or standing for more than very short periods, limits her ability lift more

that very light weights, and prevents her from climbing stairs or running even a single step.

(2) Near the beginning of her employment with Defendant United Space Alliance, Ms. Blummer suffered another leg fracture as a result of her disability, resulting in even more severe pain than usual. This injury and pain required her attendance at various medical appointments and therapies, and also caused her delay in getting to work when the pain was at its most severe.

(3) As an accommodation for her disability during this most-difficult period, Plaintiff repeatedly asked for a flexible morning schedule (i.e., coming in late when necessary and making up the time by working through lunch or staying late), and the ability to telework on occasion.

(4) Defendant's response was to take away her leg-rest for a period of weeks;  repeatedly ask for overbroad medical releases even though releases and medical records had already been provided; unnecessarily delay any meaningful response; ignore the requested accommodation and instead intentionally misconstrued it; refuse to allow Ms. Blummer to explain her actual needs to the accommodation decision makers; refuse to consider any other accommodations; refuse to engage in the flexible interactive process to attempt accommodations; and ultimately decide unilaterally, and in isolation, that Defendant would not provide

either of the requested accommodations, or any others.  Instead, Defendant fired Ms. Blummer the next day.

(5)  Despite all that, Defendant now claims that it entirely satisfied it accommodation obligation because, several weeks earlier, it had provided an ergonomic assessment of Ms. Blummer's workspace and had permitted her to arrive at 8:30 a.m.  But neither of those are true accommodations because they are offered to all workers, and more to the point, they would not accommodate Plaintiff's disability.  In essence, Defendant claims that it can call things that are already provided by company policy "accommodations," and then ignore all subsequent requests.  That is not the law, as shown below.

## II. STATEMENT OF FACTS

Critical parts of Defendant's Motion for Summary Judgment are based on half-truths and misleading inferences.  Defendant may choose to attempt this "spin" in its favor with the jury, but it not permitted to do so on summary judgment.  The following facts are supported by evidence contained in the Appendix of Evidence in Opposition to Defendant's Motion for Summary Judgment, or reasonable inferences from that evidence.  To the extent these facts contradict Defendant's "Statement of Undisputed Facts," Defendant's Motion for Summary Judgment, p. 5-18, they are in dispute.

### A.    Plaintiff's Disability

From the moment Ms. Blummer was hired by USA she informed Defendant of her disability through various means. *See* Ex. A (Blummer Aff. 3-4, Feb. 21, 2010); Ex. B (Robbins Dep. 29:12–15, 50:1-9, Nov. 16, 2009); Ex. C (Vawter Dep. 22:3–25:20, Dec. 14, 2009); Ex. C (Vawter Dep. Ex. 1 [USA 889] and Ex. 2 [USA 901]); Ex. D (Lee Dep. 137:14–138:14, Nov. 17, 2009);  Ex. D (Lee Dep. Ex. 13 [Pl. 000229]); Ex. E (Alaniz Dep. 23: 5–16, Dec. 14, 2009);  Ex. F (Corneillie Dep. 40:3–21, Nov. 16, 2009).

### B.    Plaintiff's Job Duties

Ms. Blummer was employed by Defendant from May to November 2007. She was a CEV Avionics Integration Laboratory ("CAIL") Certification Analyst, but for payroll purposes her title was "Engineering Staff I."   As a CAIL Certification Analyst, she wrote requirement and design documents with the CAIL Documentation Team, developed test plans, and participated in weekly team meetings for the CEV Avionics Integration Laboratory.  Ex. A (Blummer Aff. 3); Ex. B (Robbins Dep. 23: 2 – 24:5); Ex. B (Robbins Dep. Ex. 2 [USA 10]).

Prior to this employment Ms. Blummer had been employed by Boeing for almost three years, and was transferred to Defendant as a "payroll transfer," to be effective May 5, 2007.     Ex. A (Blummer Aff. 3), She "had all the right qualifications to be hired for the position."  Ex. B (Robbins Dep. 28:15-16).

**C.      The Quality of Plaintiff's Work Was Not the Issue**

The actual quality of Ms. Blummer's work was not of concern while she was employed by Defendant.  With regard to her work, Defendant viewed her as very bright.  Ex. E (Alaniz Dep. 72:13-16); Her team leader Corneille testified that her technical summaries were good, Ex. F (Corneillie Dep. 102:2-9), as was the editing work she did to assist her colleague.  *Id.* at 37:10-19.   The Director of HR confirmed this, and that she earned compliments for her work.  Ex. D (Lee Dep. 129:22 – 130:21).  On at least one occasion her work was held up as an example to others.  Ex. A (Blummer Aff. 8).  More to the point, Defendant has admitted that Ms. Blummer was not terminated because of poor work, but because of its failure to accommodate her.  See pp. 48–49 below.  As the HR Director and chair of the committee that decided to fire her testified, if they had been able to accommodate Ms. Blummer, there would have been no need for the firing committee.  Ex. D (Lee Dep. 92:24–93:9).   Defendant's Motion mischaracterizes Plaintiff's work performance by ignoring this testimony.

**D.      Defendant's Little-Understood, Disconnected, and Bizarre Accommodation System**

The Defendant's accommodation policy was completely dysfunctional.  First, there was no written accommodation policy, Ex. E (Alaniz Dep. 14:1-6); Ex. D (Lee Dep. 16:2-6), although Defendant had a written policy for almost everything. Ex. E (Alaniz Dep. 14:13-18).  Tellingly, Defendant adopted their first

written accommodation policy just days after the incidents in this case.  Ex. E (Alaniz Dep. Ex. 5 [USA 1714]); Ex. D (Lee Dep. 18:4-17, 38:23-25); Ex. D (Lee Dep. Ex. 2 [USA 1714]).  The reason for that will become plain, even if the process itself is not.

According to HR the original request for accommodation need not be in writing, or made to a particular person.  Ex. E (Alaniz Dep. 18:3-8).  If made to the employee's supervisor, they are not allowed to discuss disability issues.  As a result the manager has no information about the disability-related reasons why the employee might be absent.  For example, the manager is just told that the employee would be there or not there, sick or not sick.  The manager is deemed not to need any other information.  Ex. B (Robbins Dep. 50:1-24).

Instead, the employee's manager supposedly refers all disability-accommodation matters to the Health Services Department, *Id.*, which consists of a single person, the company nurse.  Ex. C (Vawter Dep. 10:11-14.  Bizarrely, the nurse—who is ostensibly in charge of the accommodation process and who is under HR—does not report to the HR Director but instead to the Compensation Department, Ex. D (Lee Dep. 33:21 – 34:12; 52:16-22); Ex. C (Vawter Dep. 101:5-12).  As a result, the HR Department is not aware of what ADA training the nurse gets.  Ex. D (Lee Dep. 33:21 -34:8).

Although the accommodation requests are supposedly funneled through the nurse, in circular fashion the nurse in turn is supposed to work with the referring manager on the accommodation issue, and also with the HR representative.  *Id.* at 18:18 -19:5, 21:1-6.  As far as her relationship to HR, she presents them with what the doctor has requested, and that's it; she does not actually approve it.  Nor does she give HR any medical documentation.  Ex. C (Vawter Dep. 93:7-14).

The HR rep is "the interface" who provides resources or information that the employee may need in the accommodation process.  But the HR rep does not have a role in the actual forms or information being given to the nurse, which is strictly between the employee and the nurse.  Ex. E (Alaniz Dep. 23:17 – 24:3).  The HR rep and the HS nurse are supposed to keep in communication as far as the status of the process, although they do not discuss anything specific to medical information.  *Id.* at 28:3-13.  HR sees the actual request, meaning verbatim what it says, but they do not know what the medical condition is.  Ex. D (Lee Dep. 110:12-24).

The accommodation process supposedly begins with the company nurse in the onsite clinic.  Ex. C (Vawter Dep. 12:2-5).  The first step is supposedly getting the company accommodation form signed by the employee's doctor.  Ex. D (Lee Dep. 19:11-22).  Once completed it is returned to the nurse. Ex. C (Vawter Dep.12:18 -13:6).

According to HR, the employee can initiate the accommodation process with their manager (who would refer them to the nurse) or to HR (who would refer them to the nurse for proper instructions).  Ex. E (Alaniz Dep. 17:19 – 18:8).  But the managers do not always refer employees to the nurse.  Sometimes, if the manager does not think an accommodation can be provided, he contacts HR directly.  Ex. D (Lee Dep. 24:12-20).

But there are numerous exceptions to the above.  If the accommodation sought is ergonomic, it does not go through the nurse.  *Id.* at  19:24 – 20:3).  Also, the Ergonomics Department has its own accommodation request form. *Id.* at 54:20 – 55:2 and Ex. 7 [USA 859].  On the other hand, the nurse might be involved in the ergonomics process.  *Id.* at 55:17 – 56:3.  Her name may also be on that form.  *Id.* at 91:3-20.[1]

Likewise, if the accommodation involves lunchtime schedules or teleworking, those are the province of the employee's own manager.  Ex. C (Vawter Dep. 36:25 – 37:5, 68:2-7).  The manager has to approve telework.  Ex. E (Alaniz Dep. 40:8-15); Ex. E (Alaniz Dep.  Ex. 7 [USA 1720-1728]).

According to the nurse, flexible-schedule accommodations are things that HR would decide on, not the nurse, Ex. C (Vawter Dep. 54:19-25), and she is cut

---

[1] Note that in some ways ergonomic accommodations are not true accommodations, because an ergonomic evaluation is offered to every employee regardless of whether they have a disability or not.  Ex. D (Lee Dep. 20:4-21).

out of the loop and does not interact with HR about it.  *Id.* at 54:19 – 55:4). But according to HR, it is the employee's manager who must approve schedule changes or flexible schedules.  Ex. E (Alaniz Dep. 40:2-7).

Similarly, the nurse has no control over matters of medical leave if under FMLA, which is also handled by HR.  Ex. C (Vawter Dep. 64:1-12).

Not surprisingly, the Byzantine and compartmentalized accommodation process was not well understood by Defendant's employees.  For example, Ms. Blummer's team leader, Amy Corneillie, a member of the management team, Ex. F (Robbins Dep. 74:23-75:2), thought the manager was more involved in the accommodation process, although she knew that some of them went through HR while others went through the nurse.  Ex. F (Corneillie Dep. 74:22-75:2).  She also was surprised to hear that when Ms. Blummer attempted to approach her manager about her condition, he would not hear any of it, *Id.* at 51:2-8, and had never heard of a company policy like that.  *Id.* at 69:12-19.  And when Ms. Blummer approached her team lead about accommodations because of her medical condition, Corneille told her to go through her manager.  *Id.* at 62:9-15.  Corneille does not recall receiving training on ADA accommodations, and she did not know what the Defendant's policy was.  *Id.* at 70:1-11.

The Defendant fully expected that its employees would go to their manager or to their HR representative, Ex. D (Lee Dep. 27:11-23).  The HR rep acts as an

advocate for the employee, the manager, and the company.  *Id.*  The HR reps are trained on the ADA's reasonable accommodation obligation.  *Id.* at 29:10-19.

According to HR, the employee's managers are trained on the ADA's accommodation obligation, Ex. E (Alaniz Dep. 22:2-11), Ex. D (Lee Dep. 28:9-20), and on Defendant's own policies of what to do, Ex. D (Lee Dep. 28:21 – 29:9), but according to Ms. Blummer's own manager, not only was he not specifically trained on ADA accommodations, he did not even know the company's own policy on the subject.  Ex. B (Robbins Dep. 52:20 – 53:2).  Nor did he know that the company doctor would be involved.  *Id.* at 54:24-25.  And he thought that Ms. Blummer was going to the nurse for medical care; he was not aware she was going as party of the accommodation process.  *Id.* at 108:10-22.  In fact, he had never had an employee request an accommodation before.  *Id.* at 55:18-25.

If the requested accommodation is something that the Defendant could not provide, or did not understand, it would supposedly work with the employee, and potentially with their doctor, and the company doctor would interface with them. Ex. D (Lee Dep. 21: 14 – 22:9).  For that reason there is a release of information form contained in the accommodation form itself.

Sometimes, though, the Defendant requires a *separate* release, even if it is only to allow the company doctor himself access to the medical information. Ex. E

(Alaniz Dep. 18:19 – 19:3).  (At all relevant times the company doctor was James Vanderploeg.  *Id*.; Ex. D (Lee Dep. 102:7 – 103:6).)

Generally, the company nurse would send the information to the company doctor that there is a request for accommodation, and she would ask that he review or to interact with the requesting physician.  Ex. G (Vanderploeg Dep. 14:5-17, Dec. 14, 2009).  The company doctor would then talk to the employee's doctor, would report back to the nurse, and she would write up something for HR.  Ex. E (Alaniz Dep. 19:4-14).

As the above reflects, the system was set up to fail, and is certainly not designed to reach a timely decision on accommodations.  Yet the HR Director admitted that the accommodation process should be handled, and the accommodations implemented, as rapidly as possible. Ex. D (Lee Dep. 22:23-23:6). One reason is to avoid discipline for disability-related behaviors.  According to the HR Director, any time an employee exhibits behaviors that are determined to be unacceptable but that may be due to a medical condition, we ask them to go and seek advice and counsel from their physician to turn in any kind of accommodations that they may need.  *Id.* at 35:1-14.  Also according to her, "We try to work with the employee for a successful outcome."  *Id*. at 25:24-25.  Ms. Blummer's HR rep Alaniz also admitted that it's important, during the accommodation process, to assure timely responses so that you're not seeing a

situation where somebody is progressively being disciplined.  Ex. E (Alaniz Dep. 33:3-16).  She also said that the employee's manager is made aware of the process. *Id.* at 33:19-34: 4; 50:14-51:1.

HR Director Lee testified that the required "flexible interactive process" for determining an accommodation means that when an employee requests an accommodation, there should be a flexible interchange in order to meet the individual's accommodations needs and ability for them to be able to work, but also to meet the needs of the business.  As a result, she admitted that the defendant should not limit its consideration to the specific accommodations requested; the Defendant should consider other things as well because it may be able "to do something other than that to still meet the needs of everyone."  Ex. D (Lee Dep. 15:13-16:1).  The HR Director also testified that Defendant should consider any request.  *Id.* at 23:7-11.

Ultimately, if the Defendant does not think it can provide an accommodation, or has not figured out what accommodation should be provided, the decision is made by an accommodations review committee. *Id.* at 23:22-24:1.

## E.     Flare-Up of Plaintiff's Disability

In May of 2007 Ms. Blummer's suffered from another bout of severe multiple fractures in her right femoral neck due to her disability. Ex. A (Blummer Aff. 2).  This caused her more severe pain than usual and adjustments had to be

made to her pain medication causing episodes of sleepiness as well as difficulty sleeping. *Id.* at 1-3, 5.

**F.     Plaintiff's Request for Accommodations and Attempts to Negotiate Defendant's Crazy-Quilt Bureaucracy**

> ***Plaintiff immediately discloses her disability and her need for leave, and first talks to all the accommodation players—her manager, HR staff, and the nurse***

Ms. Blummer came to Defendant effective May 5, 2007, as a "payroll transfer" from Boeing. *Id.* at 3. As part of the "New Hire Security Package," Ms. Blummer completed a "Voluntary Self-Identification Record" form identifying herself as an individual with a disability. *Id.* Ex. D (Lee Dep. 137:17 – 138:22); Ex. D (Lee Dep. Ex. 13 [Pl. 000229]).

On May 7, 2007, Ms. Blummer began her work for Defendant, and reported to its Training Academy for HR orientation. The HR representative, Valerie Garza, saw that Ms. Blummer had disclosed her disability and spoke with her about it. Garza told her that if she did not know what accommodations to request that she can do so at a later time. The next day Ms. Blummer contacted Ms. Garza again inquiring about accommodations, and Ms. Garza told her to contact the company nurse, Laneil Vawter. Ex. A (Blummer Aff. 3); Ex. C (Vawter Dep. 35:24-37:15); Ex. C (Vawter Dep. Ex. 4 [USA 895-896]). But Defendant gave no specific information on the ADA or the accommodation process at orientation. Ex. E (Alaniz Dep. 17:7-18).

13

Following orientation, Ms. Blummer reported to Defendant's main building at 600 Gemini, and met her manager and co-workers.  At that time she asked to speak to her manager about her disability and to answer any questions he might have.  He refused to discuss it and referred her instead to the company nurse.  Ex. A (Blummer Aff. 4); Ex. E (Alaniz Dep. Ex. 2 [USA 189-192]); Ex. B (Robbins Dep. 50:1-7).  According to him, the manager was just to be told whether the employee would be there or not there, sick or not sick, and did not need any other information.  Ex. B (Robbins Dep. 50:10-17).  (Blummer's team leader was later surprised to hear that reaction from the manager, Ex. F (Corneillie Dep. 51:2-8), and had never heard of such a company policy.  Ex. F (Corneillie Dep. 69:8-19)).

Ms. Blummer also asked her manager about his expectations regarding her work schedule, and he advised that she discuss it with her lead, Amy Corneille, and report back to him. Ex. B (Robbins Dep. 57:16-59:8) Ex. B (Robbins Dep. Ex. 6 [USA 869-886, 628-629]).  Ms. Blummer informed her manager of her need to arrive by 9am. Ex. B (Robbins Dep. Ex. 6 [USA 869]).[2]  But Ms. Blummer also knew that she would need leave time for physician appointments and the like, and to deal with pain, so on the same day she emailed the company nurse Laneil Vawter, inquiring about FMLA leave (which she has used at Boeing) and

---

[2] Ms. Blummer's team lead also approved her to come in later in the morning at the outset, but told her that if she needed to make it permanent, she should just talk to her manager.  Ex. F (Corneillie Dep.77:6-78:6).

requesting a meeting.  Ex. A (Blummer Aff. 3-4); Ex. C (Vawter Dep. 17:7-14); Ex. C (Vawter Dep. Ex. 1 [USA 889]).

> ***Early accommodation discussions—more information from Plaintiff, manager's inflexibility, and nurse's confusion about FMLA***

At her May 10 meeting with the company nurse, Ms. Blummer discussed her disability and her accommodation needs as well as FMLA.  Ex. A (Blummer Aff. 3-4).  Although the nurse had been trained on FMLA's requirements, Ex. C (Vawter Dep. 23:7-9), she did not inform Ms. Blummer that as a new employee, she was ineligible for it.  Instead, in response to Ms. Blummer's need for leave, she simply gave her an FMLA leave-request form.  She gave her nothing else, i.e., no ADA *accommodation* request form. Ex. A (Blummer Aff. 4); Ex. C (Vawter Dep. 24:3-5).

During the month of May Ms. Blummer had numerous conversations with Nurse Vawter, and provided her with extensive information regarding her disability, including medical x-rays, information from her treating physician Dr. Valerae Lewis, and medical articles. Ex. A (Blummer Aff. 8);  Ex. C (Vawter Dep. 28:18 – 29:19, 59:13 – 60:5, 65:2-14); Ex. C (Vawter Dep. Ex. 3 [USA 892-894]); Ex. C (Vawter Dep. Ex. 13 [USA 962-964]) .  At that time Vawter did not share this information with anyone else.  Ex. C (Vawter Dep. 31:11 – 32:2).[3]  They also

---

[3] Vawter claimed that she later shared this information with the company doctor, Ex. C (Vawter Dep. 35:8-17,

talked about accommodations for Ms. Blummer during this time. *Id.* at 26:19-27:5. Ms. Blummer also kept her manager informed of her contacts with the nurse, Ex. B (Robbins Dep. 51:16-52:3), and also kept her team lead informed as well. Ex. F (Corneillie Dep.70:18-71:3). Near the beginning of her employ, Ms. Blummer discussed her disability with her technical lead Corneille, in order to give her a heads-up that she would have doctors' appointments. *Id.* at 40:17-24. She also let her know each time she was out for that. *Id.* at 41:5-11. Within the first few months Ms. Blummer had also showed her lead some of her x-rays, and talked to her about her condition. *Id.* at 42:1-15.

### *First discussions about alternative or flexible schedules*

During this time Ms. Blummer asked her manager (Robbins) about having an alternative work schedule as an accommodation, because she had difficulty with soreness and pain, particularly in the morning. Ex. A (Blummer Aff. 5). According to HR, Defendant's managers are trained on the ADA's accommodation obligation and company policy, Ex. E (Alaniz Dep. 22:2-17); Ex. D (Lee Dep. 28:1-29:9). Blummer's manager denied that, and had not ever had an employee request an ADA accommodation before. Ex. B (Robbins Dep. 52:20-53:2, 55:18-25).

---

but he denies it. Ex. G (Vanderploeg Dep. 11:20-12:6, 20:3-11).

### *Defendant allows flexible schedules for others*

Defendant had no set policy for work hours in the CAIL Department.  Ex. D (Lee Dep. 40:20-23).   In fact, Defendant permitted a flexible work schedule for others, Ex. E (Alaniz Dep. 39:12-16); Ex. B (Robbins Dep. 59:3-23); Ex. B (Robbins Dep. Ex. 6 [USA 869-886, 628-629]), as well as alternative or deviated schedules. Ex. B (Robbins Dep. 103:19-104:3).[4]   For example, Ms. Blummer's own manager had approved one so that another employee could take continuing education classes *Id.* at 104:1-16.   Other examples were for employees going to school, or for a "9/80" schedule that allows the person to take every other Friday off.   Ex. D (Lee Dep. 114:19-115:7).   In fact, Blummer's lead (Corneillie) had herself been given such a flexible schedule when she went back to school for her MBA, Ex. F (Corneillie Dep. 21:13-21), she came in late one day or left early one day, that kind of thing.  *Id.* at 22:1-10).   Also, Corneillie herself approved Ms. Blummer coming in later in the morning at the beginning of her employment, although she told her that if Ms. Blummer needed to make it permanent, just to talk to her manager.  *Id.* at 77:6-78:6.   In fact, when Ms. Blummer's manager later asked her team lead's opinion about it, Corneillie agreed with a schedule deviation as long as the meetings were covered.  *Id.* at 81:20-82:2.   As shown below, that was not a problem.   But Defendant later refused such an accommodation for Ms.

---

[4] Defendant admits that even without a policy allowing flexible work schedules, such might constitute a reasonable accommodation under the ADA.  Ex. D (Lee Dep.44:8-14).

Blummer, ostensibly because she was having attendance problems, Ex. E (Alaniz Dep. 43:9-22), and had been given an informal notice about her absenteeism rate. Ex. B (Robbins Dep. 105:17-19).  In perfect Catch-22 pattern Defendant refused to give her a flexible schedule because she needed one.

### *Defendant provides for telework arrangements, and Blummer is a good candidate*

Defendant also provides telework options, even outside the accommodation context, Ex. E (Alaniz Dep. 55:21-57:15),[5] and it had been provided before for reasons other than disability. Ex. D (Lee Dep. 116:14-17). For example, Blummer's own technical lead Corneille was allowed to do it for during her pregnancy.  Ex. F (Corneillie Dep. 19:1-21:8, 69:23-25).  According to her, she simply got manager approval, took the telework training, filled out a form confirming that training, and got the software to install on her home computer. Then she set up her schedule with her manager.  After that, she simply logged in to Defendant's network through the security software that they give you.  *Id.* at 19:1-20:8.  All security issues were addressed by installing a security CD on her home computer, and there was never a problem with that.  *Id* at 74:3-12; *See also* Ex. D (Lee Dep. 42:8-12).[6]

---

[5] Defendant also admits that its telework policy could itself be changed as a reasonable accommodation.  Ex. D (Lee Dep. 44:1-7).

[6] Moreover, not all Blummer's work was confidential. Ex. F (Corneillie Dep. 17:2-8).  Most was "sensitive" but not classified (meaning you just got training and then had permission to view the documents).  *Id.* at 17:2-18:7.

On May 24, Ms. Blummer also asked her Team Lead (Corneillie) about the possibility of telecommuting during times she would need to be out of the office for various medical appointments and procedures.   Ex. F (Corneillie Dep. Ex. 8 [USA 350-351]).   Corneillie told Ms. Blummer about the policy and that she had to get approval from your manager.   *Id.* at 73:9-74:2.   Corneillie considered Ms. Blummer a candidate for telework, and thought that she could have done it.   *Id.* at 74:13-21.   She knew of no reason why Ms. Blummer's manager would have to deny it.   *Id.* at 98:5-12.   But he did.   Shortly afterwards Ms. Blummer told team lead Corneillie that she had attempted to get telework approval from her manager. *Id.* at 91:7-92:12.   But Ms. Blummer's manager refused it; he told her that although she could write up a request, he would not approve it.   Ex. A (Blummer Aff. 10).

### *Blummer could have joined company meetings by teleconference*

There were a lot of meetings to attend, but they did not all need to be attended in person.   Ex. F (Corneillie Dep. 82:3-10).   Even for the other meetings, Ms. Blummer's manager admitted that attendance was merely a *preference*, not a requirement.   Ex. B (Robbins Dep.71:1-6).   Team lead Corneille said the same thing.   Ex. F (Corneillie Dep. 82:3- 83:16, 93:10-94:25); Ex. F (Corneillie Dep. Ex. 7 [USA 1480-1481]).

Others joined these meetings by phone.   Ex. A (Blummer Aff. 10); Ex. F (Corneillie Dep. 82:13-18).   In fact, there was no conference room big enough for

all the meeting attendees to fit in.   Ex. F (Corneillie Dep. 82:20-83:5).   Few meetings actually required attendance, *Id.* at 83:17-84:4, and even for those there was no hard rule about it.   *Id.* at 95:4-13.

Ms. Blummer had been asking for the ability to attend by phone since her first couple of weeks of employment.   *Id.* at 84:8-20.   Teleconference equipment could have been set up.   *Id.* at 94:6-25.   And Ms Blummer could have joined from home just as other people joined from their desks.   *Id.* at 104:6-16.   Indeed, at one time or another almost everyone would teleconference in to meetings.   *Id.* at 23:11-18; *See also* Ex. B (Robbins Dep. 74:2-7). The Defendant's client and partner themselves (Lockheed and NASA) conferenced in from outside.   Ex. A (Blummer Aff. 10); Ex. F (Corneillie Dep. 23:21-24:6).

### Ms. Blummer made early and repeated requests for immediate accommodations

Team leader Corneillie admitted that Ms. Blummer approached her about accommodations because of her medical condition, including the possibility of calling in to meetings, working from home, and other things. Corneillie referred her to her manager Robbins, and Corneillie probably cc-ed Robbins on some of Ms. Blummer's requests. Ex. F (Corneillie Dep. 62:9-63:13).

During the month of May and into the beginning of June Ms. Blummer had several medical appointments, and her disability and attendant pain prevented her from arriving at work by 8 a.m.   She tried to tell her manager and lead that her

disability was affecting her attendance, but she was told that management could not hear any medical information from employees.  Ex. A (Blummer Aff. 4, 6).

On June 4 Ms. Blummer spoke by phone with the company nurse, again asking about the accommodations that they had discussed previously.   Ex. C (Vawter Dep. 27:20-25).   Ms. Blummer asked her help with accommodations, including flexibility on her start time.  *Id.* at 24:13-27:11; *Id.* at Ex. 2 [USA 891]). Vawter admitted that Ms. Blummer had stressed her *immediate need* for that a flexible start schedule and time off for doctor's appointments.  *Id.* at 27:12-19.

### Blummer's mounting frustrations with accommodation delays; nurse still referring to FMLA leave for absences; FMLA form submitted

Ms. Blummer also expressed to the nurse her frustration that her manager would not discuss her disability, because that made it difficult to explain her need for a more flexible schedule.  Ex. C (Vawter Dep. 24:13 -25:16); Ex. C (Vawter Dep. Ex. 2 [USA 891]).  The nurse told her that by company policy she should not talk about her condition with her manager.  *Id.*  Ms. Blummer email asked, however, "What are my options?  Are you able to help me?"  *Id.*

On June 5 Ms. Blummer sent another email to Nurse Vawter, providing her with current medical records in order to explain her condition and to get Vawter's help seeking accommodations.  Ex. C (Vawter Dep.  Ex. 3 [USA 892-894]).

On June 6 Ms. Blummer had an appointment with her doctor Valerae Lewis, and with rehabilitation therapists.  During the appointment with Dr. Lewis she discussed her job duties and her doctor's recommendations.  Dr. Lewis filled out the FMLA form the nurse had given Blummer, and gave it to Blummer for delivery to the Defendant.  Ex. A (Blummer Aff. 4).

On June 7 Ms. Blummer hand-delivered the completed FMLA form to the company nurse, in an effort to comply with the Defendant's accommodation process as it had been explained to her.  *Id.*

### *Blummer's request of HR for help with schedule accommodations to address absences results in disciplinary action for those same absences, and even less schedule flexibility*

On the same date, June 7, Ms. Blummer emailed Ms. Thelma Alaniz, her HR representative Ex. E (Alaniz Dep. 24:4-22); Ex. E (Alaniz Dep. Ex. 1 [USA 1409]).[7]  Alaniz had received ADA training, *Id.* at 11:3-24, and had already been in contact with Ms. Blummer during the first week or so of Blummer's employ. *Id.* at 24:19-22.   (During those occasions when Ms. Blummer brought up her disability, Alaniz would refer her back to the company nurse.  *Id.* at 26:16-21.)  On *this* occasion Ms. Blummer wanted to confirm that she had the correct information about the accommodation process because of the lack of progress she was having. Ex. A (Blummer Aff. 5-6); Ex. E (Alaniz Dep. Ex. 2 [USA 189-192]).   Alaniz

---

[7] Ms. Blummer was later told that Alaniz would be her point of contact for accommodations, Ex. E (Alaniz Dep. 37:11-23, although that would not work any better.

agreed to meet with her the next day.  Unbeknownst to Ms. Blummer, on the same day her manager Robbins had also contacted Alaniz about Ms. Blummer's disability-related attendance, and Alaniz invited him to join the meeting set for the following day.  Ex. A (Blummer Aff. 5-6); Ex. E (Alaniz Dep. Ex., 1 [USA 1409]).

On June 8, Ms. Blummer went to meet with Alaniz with the intention of discussing the accommodations process and the problems she had been having with it.  Instead, Ms. Blummer's manager and lead were at the meeting, and her manager presented her with her first disciplinary action, a "Documented Verbal Counseling – Absence."  Ms. Blummer was told that she had accumulated too many sick hours during her first month with Defendant.  She was also told that she would have to start emailing her manager within ten minutes of her arrival at work every day.  She was also told that her work hours would remain 8 to 5, even though her manager knew about her disability, and about her efforts to work through the company nurse.  Ms. Blummer left the meeting and went immediately to see Nurse Vawter again, pleading for help with her accommodation request.  Ex. A (Blummer Aff. 5-6);

While Plaintiff was struggling through the accommodation request process, she had been missing work and reporting to work late on occasion due to the effects of her disability, and due to the various appointments and procedures she needed to attend to care for her disability.  Even though by this time Defendant

was aware of Plaintiff's disability and of her requests for accommodations, Defendant began issuing disciplinary warning letters and notices.  Ex. A (Blummer Aff. 5).

>   ***Blummer seeks more schedule flexibility and asks specifically about the ADA; she is finally given the proper form for her doctor to complete, which she does; contacts Diversity office in frustration***

On June 12, 2007, Ms. Blummer emailed her manager about the possibility of reducing her workday schedule by working through lunch, as others did.  He initially approved a change to 8 a.m. to 4:30 pm. with a 30-minute lunch.  But on June 13, her manager rescinded that schedule change.  Ex. A (Blummer Aff. 6).

Ms. Blummer sent another email to the nurse asking for her help in working out a schedule accommodation, and also asking if the ADA applied.   Ex. C (Vawter Dep. Ex. 4 [USA 895-896]).   She also visited with the nurse, who admitted that Ms. Blummer was covered by the ADA.  *Id.* at 36:5-17.  The nurse also gave her the contact information for Shawna Holman-Harries, who was in charge of Defendant's ADA compliance.  *Id*. at 37:6-12.  The nurse also said that schedule changes regarding lunch were not her department, and must be handled with the individual manager.  *Id.* at 36:25-37:5.  The nurse reported this conversation to Ms. Blummer's HR rep Alaniz.  *Id.* at 37:16-24.

On about June 13 the nurse finally told Ms. Blummer that she was not eligible for FMLA leave, and that the FMLA form was not the process for

requesting reasonable accommodations. Ex. A (Blummer Aff. 4). Although company policy did not require an accommodation request be on any particular form, Ex. C (Vawter Dep.28:1-4), Ms. Blummer was required to fill out another form for her accommodation request. Ex. A (Blummer Aff. 7).

On June 14 Ms. Blummer looked online for company policy regarding accommodations, and contacted Alicia Busby, Defendant's Diversity and Compliance Officer, because she was so frustrated and so in need of assistance in getting accommodations put in place as soon as possible. The accommodations that Ms. Blummer asked Busby for were a flexible start time, an accessible path from her vehicle to her office, flexibility for my medical appointments, and a telework option. Ex. H (Blummer Dep. 198:10-199:6, Oct. 27, 2009); Ex. H (Blummer Dep. Ex. 22 [USA 197]).

> ### *Ms. Blummer's condition temporarily worsens, and she has increasing need for accommodations; but Defendant refuses any morning schedule accommodations, and then prohibits staying late or working through lunch*

During this time period she was still struggling with her disability and my required arrival time to work in the morning. In June of 2007, as a consequence of her disability she had severely fractured her right femoral neck, causing even more than usual pain. She had many medical appointments regarding this fracture, how to treat it, and how to manage the pain. Her pain medication was also being adjusted to find the most effective level, but she continued to feel extreme amounts

of pain, and suffered from the side effects of her pain medication, including sleepiness.  Ex. A (Blummer Aff. 2, 5).

During this same time period, Plaintiff was being assigned new projects, including drafting written summaries of material that the Plaintiff and her co-workers were assigned to read.  Although her co-workers had to read the same documents, Plaintiff was the only one required to write summaries of what she read as proof that she actually read the documents.  Ex. A (Blummer Aff. 6-7).

Corneillie recalled an occasion in the Summer of 2007 when Ms. Blummer went to her lead and her supervisor to say that she was in a lot of pain, and wasn't sure if she could continue the work that day, because she was just kind of out of it, and she was just scared and didn't know what to do, is what she said.  The supervisor said that she could go home, but she had already been counseled about excessive absences at that point, and she chose not to leave.  Ex. F (Corneillie Dep.54:5-55:7).

On June 15, Blummer was again in a lot of pain but went to work anyway, telling both her team lead and acting manager that she was afraid of losing her job if she called in sick.  Her team lead documented this to the HR Manager Sellers, the HR rep Alaniz, and to Ms. Blummer's own manager.  The HR Manager indicated that "her fears are irrational."  *Id.* at Ex. 6 [USA 1421-1422].  He was clearly wrong, as shall be seen.

Team leader Corneillie also documented the fact that Ms. Blummer had not been able to get in touch with the company nurse.  *Id*.  Corneillie also pointed out that Blummer had been working through lunch and would reach her 40 hours about midday on Friday, and Corneillie asked if Ms. Blummer could leave at that time. The HR Manager indicated that working through lunch was contrary to the instructions of Ms. Blummer's manager, and that Ms. Blummer should be disciplined. He also refused to allow the Team lead to approve Ms. Blummer leaving work early, hinting that the lead herself could be disciplined for approving it.  *Id*.  He also indicated that Ms. Blummer should leave only if she posed a direct threat to herself or others.  *Id*.

Later that day the team lead, Corneillie, and acting manager met with the HR Manager and HR rep.  Afterwards, they met again with Ms. Blummer, denying her request to leave early, even though she had already put in 40 hours, but indicating she could go home if she had to. She indicated that she would stay for fear of losing her job.  *Id*.  Ms. Blummer also indicated that she had given all the relevant medical documents justifying a work deviation under company policy, and she offered to show her lead and manager that medical evidence, which they refused to look at.  *Id*.  They also told her that she had to keep to a strict 8-to-5 schedule.  *Id*. On other occasions when she tried to come in later and work through lunch, her

manager would tell her not to bother to come in.  Ex. A (Blummer Aff. 7); Ex. B (Robbins Dep. 119:11-120:2).

### By June, everyone knows the accommodation she is seeking; she also contacts the Manager over HR

By June, Ms. Blummer's HR rep Alaniz knew the accommodation Ms. Blummer was seeking was a "flexible morning schedule."  Ex. E (Alaniz Dep. 44:5-8).  Also by June, HR Director Lee likewise admitted that she knew that Ms. Blummer was seeking a flexible morning schedule.  Ex. D (Lee Dep. 44:15-18). Alaniz also admitted that at some point she also knew that Ms. Blummer was seeking a telework option.  Ex. E (Alaniz Dep.  44:9-45:18); Ex. E (Alaniz Dep. Ex. 8 [USA 836]).

### Instead of a flexible interactive process HR yells at her, even though they knew she was sincerely trying

Ms. Alaniz knew that the ADA required a flexible interactive process for determining accommodations.  Ex. E (Alaniz Dep. 11:10-12:10).  Instead, on at least one occasion when Ms. Blummer met with her, she was angry, yelling when addressing Ms. Blummer. Ex. A (Blummer Aff. 8).  On June 21, 2007 Ms. Blummer met with the company nurse and HR Rep Alaniz regarding requesting reasonable accommodations.  During the meeting they provided Ms. Blummer with a Request for Accommodation Form for her doctor to complete, which had a medical-records release incorporated into it.  Ex. A (Blummer Aff. 7-8); Ex. C

(Vawter Dep. Ex. 5 [USA 914-915]). They also gave her a separate Release of Medical Information Form. Ex. C (Vawter Dep. Ex. 6 [USA 916]). Alaniz followed up this meeting with an e-mail. *Id.* at Ex. 10 [942].

Plaintiff again sent both forms to her doctor. On June 26 Ms. Blummer's doctor faxed a completed Request for Accommodation Form to Nurse Vawter, which requested a "more flexible work schedule" because "[o]ccasionally, she may require a bit of extra time in the morning," together with a telework option on occasion. *Id.* at Ex. 7 [USA 836]. The Request was likewise clear that the doctor expected that Ms. Blummer would be able to complete her work assignments in this way. The company nurse received it but decided that because the medical explanation was complicated, she needed to talk to the company doctor,[8] and on June 28 she insisted on a separate release form for that purpose. *Id.* at 5:12-23, 51:17-21.

At some point Ms. Vawter testified that Ms. Blummer's doctor called the company nurse, again asking that Defendant offer a flexible morning schedule. The nurse told Dr. Lewis that it would be no problem to flex the schedule up to 30 minutes. *Id.* at 38:15-39:4. She also told the doctor that taking off time for medical appointments and the like would be no problem, and that the Defendant did not question that. *Id.* at 39:5-40:9. However, this alleged phone conversation

---

[8] The Defendant apparently allows the nurse unfettered discretion in whether to call on the company doctor. Ex. D (Lee Dep. 58:12-17).

with Dr. Lewis is not substantiated in the record, including Ms. Vawter's own nurse's notes.   Nevertheless, Ms. Blummer was disciplined for absences that included medical appointments.  Ex. A (Blummer Aff. 5).  The company nurse was also being copied on these disciplinary actions.  Ex. C (Vawter Dep. 40:10-41:13).  But the nurse testified that *she knew Ms. Blummer was "very sincere, [and] she seemed like she was trying very hard to do what was needed."  Id.* at 45:10-11.

> ### *Defendant insists the Blummer sign a blank medical release, although she had already given written authorization for her doctor to talk to the company*

Although the nurse required a new Release be signed, the form she gave Ms. Blummer was blank.  *Id.* at Ex. 6 [USA 916].  Even so, Vawter asked her to sign it.  Ex. A (Blummer Aff. 7); Ex. C (Vawter Dep. 47:10-12).  Ms. Blummer did not wish to sign a blank form that would give Defendant access to all of her medical information, whether related to her disability or not.  Ex. A (Blummer Aff. 7-8); *See also* Ex. C (Vawter Dep. 48:15-49:13).  In an email dated July 2, 2007 Ms. Blummer explained to Nurse Vawter that she was uncomfortable signing the blank Release of Medical Information Form, especially since she had already provided a lot of information to Vawter, including x-rays.  Ex. A (Blummer Aff. 7-8); Ex. C (Vawter Dep. Ex. 10 [USA 940].  Moreover, she had already given written authorization for her doctor to talk to the company.  *Id.* at Ex. 6 [USA 916].

According to the HR Director, the new (blank) release was needed to get documents from other physicians and providers, Ex. D (Lee Dep. 48:18-49:8), but in fact the Defendant never attempted to contact any other provider other than Dr. Lewis (whose authorization they already had).   Moreover, the blank release form of August 6 was again just for Lewis, which did not make sense to the HR Director, and which she could not explain.  *Id.* at 51:21-52:2.  On the other hand, the HR Director refused to admit that asking an employee to sign a blank release was improper.  *Id.* at 53:14-54:9.  *See also Id.* at 89:17-90:4.

### *Defendant discontinues accommodation process; Blummer seeks lawyer's help*

On July 3, 2007 Nurse Vawter emailed Ms. Blummer that she was discontinuing her accommodation request because she would not sign the Release of Medical Information form.  Ex. C (Vawter Dep. Ex. 10 [USA 940].

That same day Ms. Blummer's lawyer faxed Defendant a letter requesting a meeting with her managers and compliance officers to discuss the reasonable accommodations she needed.  The letter went to Ms. Blummer's manager Robbins, company nurse Vawter, HR rep Alaniz, and Diversity & Compliance officer Busby.  *Id.* at Ex. 9. It was received by most of them the same day, *Id.* at 57:18-23, and Defendant's in-house counsel was immediately notified.  *Id.* at 58:3-5.  The letter requested that in the interim Ms. Blummer be allowed a 30-60 minute deviated work schedule in the morning, and the flexibility to contact her manager

if she would need additional time beyond the 60 minutes.  Again, though, the letter was clear that Ms. Blummer intended to work the full forty-hour work week regardless of the deviated schedule, by making up time during lunch or by staying later. *Id.* at Ex. 9.

The HR Director received her copy of the letter a few days later, and she understood that Ms. Blummer was seeking a flexible morning schedule.  Ex. D (Lee Dep. 50:1-17).   But according to Ms. Blummer's own manager, the Defendant never did consider a flexible morning schedule because, supposedly, it did not understand that she was asking for one. Ex. B (Robbins Dep. 118:3-7).

### *Defendant places limits on Blummer not required of others*

On July 27, 2007 Ms. Blummer met with her manager Robbins, HR rep Alaniz, HR Director Lee, and the EEO Manager Holman-Harries.  Ex. D (Lee Dep. 73:16-23).   Robbins testified that he thought this was the first time he learned about her request for a flexible arrival time, Ex. B (Robbins Dep. 63:10-19), but in fact he had been copied on a letter from Ms. Blummer's counsel almost a month earlier about it, a letter he does not recall, *Id.* at 63:20-64:2), although others do. Ex. C (Vawter Dep. 57:18-23); Ex. D (Lee Dep. 50:1-17).  They informed her that she was allowed to begin working at 8:30 a.m. instead of 8 a.m., but that she was not allowed to work past 5 p.m. without prior manager approval.  She was also instructed to email her manager as soon as she arrived to work in order to report

her arrival time, and she was told that she would be disciplined if she arrived later than 8:30 a.m., or if she worked after 5p.m. without prior manager approval.  Ex. E (Alaniz Dep. Ex. 6 [USA 203-205]).  She was also told to go through HR rep Alaniz for her accommodations.  *Id*.

Defendant later admitted that the 8:30 start time was not implemented as an accommodation, and according to HR, it had nothing to do with her disability.  Ex. E (Alaniz Dep. 55:8-13).  It was also company policy for anyone to be able to come in within 30 minutes of their start time without the need for any kind of approved schedule deviation from the manager.  Ex. F (Corneillie Dep. 79:15-22).

It was also common for other staff to work past 5 p.m., and they did not need approval for it, and only had to get permission (and then only verbal) if the work would result in overtime pay, Ex. B (Robbins Dep. 64:21-65:4), i.e., more than 40 hours per week.  *Id*. at 100:23-104:3.  In fact, employees did not actually need manager approval up to 45 hours.  Ex. F (Corneillie Dep. 87:6-88:9).  Beyond that, manager approval was routinely required, but it was rarely denied.  *Id*.  For example, Amy Corneillie worked past 5 just "to get the work done," *Id*. at 85:9-17, sometimes staying until 6:30 or 7.  *Id*. at 86:5-8.  She did not need her manager's approval.  *Id*.  On the other hand, Defendant required written prior approval from Ms. Blummer.  Ex. B (Robbins Dep. 65:22-66:3).

### *Meeting with lawyers does not help; Defendant takes her footrest away*

On August 2, 2007 Ms. Blummer and her lawyer met with Defendant's in-house counsel Eileen Groves and HR Director Lee. At that meeting Defendant informed Ms. Blummer that she could no longer use the empty computer case she had been using as a footrest to alleviate some of the stress on her (although she had used it in her prior employment with Boeing with no problems). Ex. A (Blummer Aff. 9-10). Lee told Ms. Blummer that if she used it again, it would be insubordination. *Id.*; Ex. D (Lee Dep. 139:24-140:7). Ms. Blummer was forced to fill out another accommodation request, Ex. C (Vawter Dep. 95:21-96:16), simply because the Defendant took her other footrest away. Ex. D (Lee Dep. 100:14-22). It took Defendant weeks to act on the request, and Ms. Blummer suffered through days of unnecessary pain and throbbing. Ex. A (Blummer Aff. 9-10).

### *Still no response from earlier accommodation request; Blummer signs another release; more delays*

Ms. Blummer never received any information in writing regarding the accommodation request sent by Dr. Lewis on June 26, 2007. *Id.* at 10. On August 6, 2007 Ms. Blummer signed and delivered a Release of Medical Information that was properly limited to the relevant time and to information regarding her disability. *Id;* Ex. C (Vawter Dep. Ex. 12 [USA 850]).

On August 15 Ms. Blummer emailed her HR rep Alaniz because Alaniz had promised to check with the company nurse about the status of her accommodation

request.  Ex. E (Alaniz Dep.  Ex. 3 [USA 1159-1160].  Ms. Blummer had also left voicemail and email messages for the company nurse, but had not heard back.  *Id.* Alaniz did nothing other than refer her to the nurse, *id.,* even though she admitted that it would have been perfectly appropriate for Alaniz to check with the nurse about the status.  *Id.* at 30:8-13.  Alaniz blamed the delay on the lack of signed release, even though Defendant had had a signed release for Dr. Lewis to speak to the company since June 26, 2007, Ex. C (Vawter Dep. Ex. 7 [USA 836]), and even though the *second* release had been signed and submitted over a week before, on August 6.  *Id.* at 30:2-31:5. Not hearing anything, Ms. Blummer was forced to walk over to Nurse Vawter's office, and the company nurse told her that the company doctor was on vacation, Ex. A (Blummer Aff. 9-10), although HR rep Alaniz does not recall that.  Ex. E (Alaniz Dep. 32:9-18).

On August 16, the HR Director asked the company nurse and the HR rep (with a cc to the EEO Manager) about the status of Ms. Blummer's request for a footrest, via Ex. D (Lee Dep. Ex. 10 [USA 953]), and what to do if the company doctor was unavailable.  She learned there was a back-up doctor available, *Id.* at 102:4-16, but he was never contacted.  *Id.* at 103:18-19.

The next day, August 17, Ms. Blummer likewise emailed Alaniz asking if there is a fall-back position if the company doctor could not be reached, and Alaniz agreed to check on that.  Ex. E (Alaniz Dep.  Ex. 4 [USA1163-1164].  On the same

day the Defendant's Ergonomics Department wrote that "The request for a leg rest is not within the ergonomic parameters.  It's a medical accommodation and should be addressed with health services."  Ex. D (Lee Dep. 103:23-104:11); Ex. D (Lee Dep. Ex. 11 [USA955]).

> ***Defendant finally contacts company doctor; he is given minimal information and plays limited role, simply explaining Dr. Lewis's letter; no reason for requiring second release (and attendant delays)***

Eventually the Defendant gave some information about Ms. Blummer to the company doctor, but the only things he was ever given about her medical condition was Ms. Blummer's original FMLA document request, and a statement from her treating physician, Dr. Valerae Lewis.  Ex. G (Vanderploeg Dep. 11:20-24).  He received no other information from Defendant.  *Id.* at 26:19-24.  Although the company nurse claims to have given him some of the medical record and information she had collected, in fact she never did so.  *Id.* at 12:2-6, 20:3-11.  Nor did the Defendant share with him the written accommodation request from Ms. Blummer's counsel dated July 3.  *Id.* at 29:10-18; *Id.* at Ex. 9.  The company doctor had four to six phone conversations with the company nurse about Ms. Blummer, *Id.* at 15:21-16:3, but got no other info from her about Blummer's condition other than the two documents referenced above.  *Id.* at 20:3-11.  Nor did the doctor talk to anyone else at the company about Blummer until after her termination.  *Id.* at 18:9-17.

According to the company doctor, the release Ms. Blummer signed was to allow her doctor to talk to him.  *Id.* at 16:16-20.  But Ms. Blummer had already sent it to Lewis authorizing her to talk to the company.  Ex. A (Blummer Aff.  9-10). The company doctor also indicated that he needed the release (in Ex. G (Vanderploeg Dep. Ex. 2 [USA 850]) so he could get additional medical records, but he never requested such records even after he got the release.  *Id.* at 19:10-18. The company doctor said that the company had no dispute about Ms. Blummer's condition, but just wanted the parameters of the requested flexible schedule, *Id.* at 19:19-20:2, so he did not speak to any other providers because he had no reason to. *Id.* at 24:1-9.

According to the company doctor, the initial accommodation request had four or five items that were listed having to do with time off for physician appointments and accommodation with respect to wheelchair, crutches, etc., all of which, to the best of his knowledge, were already in place.  There was also a request for flexibility of schedule without specifying what the new schedule would be, and that was why he later talked with Dr. Lewis, but that was the extent of discussion regarding accommodation.  *Id.* at 17:7-19.

The company doctor does not make any determination about what accommodation is to be granted; that is for the company's determination.  Nor does he suggest accommodations. All he does is try to determine the parameters of

those accommodations, and help translate the medical need to the company so that there is a clear understanding of that. *Id.* at 17:23-18:8.

On August 17 Defendant's doctor emailed Nurse Vawter explaining that in her form, Dr. Lewis was asking for a flexible work schedule and telework, and that Defendant would need to consider if it would provide that. Ex. C (Vawter Dep. Ex. 8 [USA 856]).

> ***Defendant still does nothing in response to input from company doctor; Blummer spending unnecessary time on it; more discipline and frustration***

Although it clearly did not say so, the company nurse claims that she interpreted the doctor's email as indicating that the Defendant was already providing all the necessary accommodations. *Id.* at 53:9-18, 56:14-18. She also said that a flexible-schedule accommodation and telework accommodations are things that HR would decide on, not her. *Id.* at 54:19-25. She stated that telework is "totally out of my realm." *Id.* at 68:6-7. HR, on the other hand, says that it is up to the manager to approve telework. Ex. E (Alaniz Dep. 40:23-41:8, 42:2-21); Ex. E (Alaniz Dep. Ex. 7 [USA 1720-1728]). In this case the manager said he would deny any request for telework that Ms. Blummer made. Ex. A (Blummer Aff. 10). In fact, he has never approved it, Ex. B (Robbins Dep. 71:17-19), although the company permits it for others. Instead of telling HR that he had denied it, though,

Ms. Blummer's manager simply told them that she had chosen not to pursue it. Ex. E (Alaniz Dep. 36:1-5).

At some point, the nurse told HR rep Alaniz about the company doctor's contact, Ex. C (Vawter Dep. 55:25-56:9), and then the nurse dropped out of the loop; she did not interact with HR about it. *Id.* at 54:19-55:4. The nurse was under the impression that HR had provided the necessary scheduling Ms. Blummer needed, *Id.* at 57:2-8, 64:20-65:1, although they clearly had not.

During most of the month of August of 2007 Ms. Blummer was without a leg rest, causing extreme pain and further stressing the fracture in my right leg. She received a replacement at the end of the month. Her pain and difficulties due to my disability continued, and she again reached out to the nurse for assistance and recommendations on what her options were in order to do my job. The nurse's only response was to get medical care from my doctor. Ex. A (Blummer Aff. 9-10); Ex. C (Vawter Dep. Ex. 13 [USA 962-964]).

Ms. Blummer's pain worsened. She wrote the nurse on September 14 about it, explaining that her ability to keep a strict 8-to-5 schedule was even less, and seeking her help in explaining her situation to her managers. Ex. C (Vawter Dep. Ex. 13 [USA 962-964]).

The nurse also knew Ms. Blummer still needed a telework option. In particular, she understood that Ms. Blummer had had a difficult time getting

through a meeting she had been required to attend in person, and that "[s]he had a legitimate concern that what was going to happen if it kept getting worse." *Id.* at 66:10-13.   The nurse told Ms. Blummer's managers about her problems.   *Id.* at 67:16-18.

Even though Plaintiff submitted her formal accommodation request for a flexible start time in mid-August 2008, she still had received no written response by early October. Ex. A (Blummer Aff. 10).  All the while, Plaintiff was struggling meeting her work demands without the accommodations that she needed.  In the beginning of October of 2007, Defendant again reprimanded Ms. Blummer regarding her attendance.  *Id.* at 5.

Ms. Blummer's team lead remembers Blummer's frustration, on one occasion because the nurse was not there, but also more than once because of miscommunications about the things Ms. Blummer had provided not being what the company wanted, e.g., one time Ms. Blummer's doctor had faxed something that turned out not to be what the nurse was looking for.  The lead also observed that there appeared to be delays because of this miscommunication.   Ex. F (Corneillie Dep. 75:15-76:12).  Her lead stated that "certainly," Ms. Blummer had to spend a lot of time trying to figure out the accommodations process and going to the nurse and HR, instead of being able to work.  *Id.* at 76:17-25.  Her lead further

admitted that this affected her job performance in the sense of being able to complete tasks.  *Id.* at 77:1-5.

### Blummer tries to get the doctors together because no one else is

On October 2, Ms. Blummer's doctor requested contact information so that she could call the Defendant's doctor directly.  In response, the company nurse told her she needed more authorizations signed, did not provide the contact information, and instead indicated that the company doctor was very busy, and would have to initiate any call. Ex. C (Vawter Dep. 70:24-72:6); Ex. C (Vawter Dep. Ex. 14 [USA 976]).  (In fact, the company doctor made himself available to Defendant on practically a moment's notice.   *Id.* at 93:23-94:8;  Ex. G (Vanderploeg Dep. 32:18-23.)  On the same day Ms. Blummer asked again about her request for a "flexible morning schedule," because she had completed the medical forms but had never received it.  Ex. C (Vawter Dep. Ex. 14 [USA 976]).

On October 5 Ms. Blummer signed at least four more release forms, which she personally delivered to the company doctor, Ex. A (Blummer Aff. 10); Ex. C (Vawter Dep. 73:8-17); Ex. C (Vawter Dep. Ex. 15 [USA 865-868]), with the expressed understanding that he would call her doctors about her accommodation needs.  *Id.* at Exs. 15 [USA 865-868] and 16 [USA 978].  That same date the company doctor contacted the company nurse indicating his ability to call Ms. Blummer's doctors, but indicating that he was awaiting her instructions before

doing so.  *Id.* at Ex. 16 [USA 978].  The company doctor also sent an email to the nurse on this date asking about the status of the case because he had heard nothing further.   Ex. G (Vanderploeg Dep. 25:11-24); Ex. G (Vanderploeg Dep. Ex. 6 [USA 978]).  He got no response.  *Id.* at 25:20-26:5. He later learned the matter of her schedule accommodation was still ongoing.  *Id.*

Ms.  Blummer  still  had  not  gotten  a  response  regarding  the *first* formal accommodation request sent June 26, 2007.  She emailed the nurse on October 8 with more medical information about her condition.  Ex. C (Vawter Dep. Ex. 17 [USA 979-986].  That same date the nurse delivered Ms. Blummer's *attendance* records to the company doctor; she did not give the doctor any other information. *Id.* at 77:19-78:4; *Id.* at Ex. 18 [USA 987-988]).

On October 9, the following day, the nurse emailed the company doctor confirming she had dropped off the information.  Ex. G (Vanderploeg Dep. 26:9-22); Ex. G (Vanderploeg Dep. Ex. 7 [USA 987-988]).  She also told the company doctor Ms. Blummer's attendance had become a "nightmare."  Ex. G (Vanderploeg Dep. Ex. 7 [USA 987-988]).

### *The doctors finally speak; Dr. Lewis cannot guarantee a set schedule and asks for flexibility; no further input from company doctor*

The nurse apparently spoke to Dr. Lewis herself first, then contacted the company doctor and asked him to call Dr. Lewis.  *Id.* at 36:15-16.  On October 11

the company doctor *finally* spoke with Ms. Blummer's doctor, Ex. C (Vawter Dep. Ex. 18 [USA 987-988]), but according to him, Dr. Lewis could not guarantee a specific time schedule.  Ex. H (Vanderploeg Dep.  23:8-23, 37:9-17).[9]

This was the company doctor's only conversation with Dr. Lewis.  *Id.* at 11:25-12:1, 38:8-12.  After emailing this information to the company nurse, he had no further role in the accommodation process.  *Id.* at 21:20-25.  He did not assist, for example, with the later accommodation request form dated Oct. 19.  *Id.* at 31:5-10.  Nor did the defendant ask him about any other accommodation for Ms. Blummer, including regarding a footrest.  *Id.* at 33:2-9.  The only accommodations the company doctor considered or was involved with were those listed in the very first e-mail, *Id.* at 34:13-23; *Id.* at Ex. 4 [USA 856]).  He never spoke further to Defendant about possible accommodations for the schedule, and he does not know if there might have been other accommodations that might have worked.  *Id.* at 34:24-35:12.  The company doctor also never spoke to Ms. Blummer herself.  Ex. G (Vanderploeg Dep. 28:4-6).

---

[9] The company doctor described the request as a completely flexible schedule, coming in whenever she wants with no guarantee as to the number of hours she will be able to work.  Ex. C (Vawter Dep. Ex. 18 [USA 987-988]).  That was not accurate, and was inconsistent with the previous written requests from Ms. Blummer, her doctor, and her lawyer.

***Blummer struggling and still wondering about status of first written ADA accommodation request from August; hears informally it is denied***

On October 12, Ms. Blummer again wrote Nurse Vawter asking about the status of her request for a "flexible morning schedule," whether she had heard from the company doctor, and offering more information if necessary.  Ex. C (Vawter Dep. Ex. 19 [USA 989]).

Ms. Blummer wrote again on October 15, saying that she was really struggling and really needed help. Ex. C (Vawter Dep. Ex. 20 [USA 992] Vawter replied that it was still being evaluated.  *Id.*

On or about October 17 Defendant's HR staff informed Ms. Blummer that she was getting another reprimand, and that her accommodation request had been denied.  Ex. C (Vawter Dep. Ex. 22 [USA 1001]). Ms. Blummer requested a copy of that decision but did not receive one. Instead, she was simply referred to HR.  *Id.* at 91:14-21.  Vawter now says that there had never been any accommodation request or any denial.  *Id.*.

***Blummer forced to sign new, inaccurate accommodation form***

On October 22, Ms. Blummer met with Vawter to sign a second Accommodation Request Form.  Neither she nor her physician drafted this second request, and it stated that she needed an entirely flexible schedule.  Ms. Blummer informed Vawter that this request was inaccurate, but Vawter said to sign it or they

would not consider any accommodation request.  Ms. Blummer signed this form

thinking she had no other option. Ex. A (Blummer Aff. 11-12);   Vawter said that

she did not see the discrepancy as a problem, Ex. C (Vawter Dep. 82:25-83:6), and

did not see the wording as any different from what Ms. Blummer had been asking

for all along, *Id.* at 83:15-21, although that was facially untrue.

On November 1, Ms. Blummer again requested a copy of the first denial, but

was told that she would have to contact her HR rep about it. Ex. C (Vawter Dep.

Ex. 22 [USA 1001])

### *Accommodations Committee meets; denies accommodations; reasons conflicting*

Also on Nov. 1, Defendant convened a panel to consider the second

accommodation request only. Ex. D (Lee Dep. 59:7-62:17); Ex. D (Lee Dep. Ex. 8

[USA 1002-1004]).   The Committee includes HR Director Lee as chair, the

director of the organization, the EEO manager, and the in-house counsel (as

consultant).  The manager also sat in to be able to state what issues the company

had at that point.  Ex. D (Lee Dep. 25:1-13); *See also* Ex. E (Alaniz Dep. 19:15-

20:4).

Ms. Blummer was not there.  The Defendant considered that her input came

from nurse Vawter, Ex. C (Vawter Dep. 76:14-77:4), although the nurse was not

present either. *Id.* at 97:15-98:11.  Nor did the committee seek any input from the

company doctor.  Ex. H (Vanderploeg Dep. 34:1-7).

The Defendant decided to deny "her" request for a "totally flexible schedule." HR rep Alaniz says the reason was that she had to attend meetings, Ex. E (Alaniz Dep. 21:1-8), which was untrue, as shown above at pp. 19–20. Defendant also denied the request for telework, but the panel members differed as to the reason for it. Robbins said it was because her boyfriend posed a conflict of interest, Ex. B (Robbins Dep. 78:13-80:19), but in fact that had been evaluated and found not to pose a conflict. Ex. A (Blummer Aff. 10-11). HR Director Lee claims that telework was never requested, Ex. D (Lee Dep. 59:19-60:8), although that is untrue as well, as shown above at pp. 19, 25, 28, 29, 38, 39, and by the fact that the committee notes reflect that it was considered. *Id.* at Ex. 8 [USA 1002-1004]. The HR Director also states that Ms. Blummer did not need telework for doctor's appointments because she had sufficient leave for them, *Id.* at 59:24-60:3,[10] but Blummer was disciplined for such appointments, Ex. A (Blummer Aff. 5), and they counted against her on the absenteeism rate.[11]

HR Director Lee states that if Ms. Blummer *had* requested to work from home, that would have been evaluated, and there may have had to be changes, in that implementation requires additional security precautions. Ex. D (Lee Dep. 60:13-61:5). Telework could have been evaluated by HR and the management

---

[10] According to her manager, she was also given permission for such medical appointments. Ex. B (Robbins Dep. 90:13-21).

[11] Defendant's excessive absences rate is calculated with the non-FMLA hours missed absence rate, the hours actually missed, divided by the work hours plus any FMLA hours missed. Ex. D (Lee Dep. 40:6-10).

team, and they could have looked to see if others were allowed to join conferences telephonically.  *Id.* at 63:11-64:4.  Committee could have also considered the tech options.  *Id.*  But none of that would have been an obstacle, as shown above at pp. 18–20.

HR Director Lee also states that the committee did not attempt to look at a different schedule, and had no specific discussion of this, but just had the attendance chart present.  *Id.* at 91:21 – 92:23.

HR Director Lee informed Ms. Blummer of the results of the committee's decision by letter, but did not discuss all the things that had been considered, or other possibilities.  *Id.* at 61:6-62:14.  In fact, she never approached Ms. Blummer to discuss other options.  *Id.* at 62:2-6.  Nor did she ever discuss Ms. Blummer's June 26 accommodation request, *Id.* at  Ex. 4 [USA 836], with her.  *Id.* at 67:5-10. Instead, HR Director Lee says that HR rep Alaniz was working with Ms. Blummer on it, but she does not know what correspondence they might have had.  *Id.* at 67:11-17.

In the end, Defendant claims that the only reason the accommodations were denied by Committee was that they would pose an undue hardship, *Id.* at 64:16-65:1.  This was untrue as shown above.

### *Firing Board convenes because accommodations denied; Blummer fired; reasons vary*

If the Committee had been able to grant the accommodations, there would have been no need for further disciplinary action. *Id.* at 92:24-93:9.[12]  But because they did not, the next day, on November 2, a Senior Management Review Board met, as per policy whenever the committee denies accommodations.  *Id.* at 65:5-15.  There, Defendant fired Ms. Blummer. The SMRB included HR Director Lee as a voting member.  As consultants, in-house counsel Groves, manager Robbins, HR Manager Pete Sellers, and HR rep Alaniz, were all present.  *Id.* at 68:14-69:20.

The witnesses give varying reasons for firing Ms. Blummer.  Alaniz states that it was her absences and untimely work.   Ex. E (Alaniz Dep. 63:15-64:10). Robbins states that it was that "infinitely flexible leave" would be undue hardship, but adds that she had low performance (i.e., sleeping on job, inability to produce product, lack of quality product, and insubordination). Ex. B (Robbins Dep. 40:1-41:18, 87:18-88:2).  His main example of insubordination was not getting permission to work past 5 p.m.  *Id.* at 99:18-24.[13]   Not only was no one else required to do so, but the Catch-22 in this is clear—she had low performance for

---

[12] Director Lee also points out that the firing board considered the accommodation committee's notes in its decision-making.  *Id.* at 69:3-13.

[13] The discussions were obviously perfunctory, or else information was intentionally hidden, because Lee claims not to have been aware that Ms. Blummer was denied the opportunity to work late.  Ex. D (Lee Dep. 89:1-5).

not getting all her work done,[14] which admittedly was because of her disability, but when she tried to catch up, that was poor performance, too.   She was never disciplined for sleeping on job. *Id.* at 94:18-20.   And her deficiencies were not in quality but amount, Ex. E (Alaniz Dep. 64:4-7); Ex. B (Robbins Dep. 97:16-98:1; 116:23-117:1); Ex. F (Corneillie Dep. 48:5-25, 102:18-103:10), and resulted from her disability-related absences and Defendant's prohibition from making up work.[15]

Ms. Blummer was not present at the SMRB, and her manager is unaware that she ever got to tell her side of the story.   Ex. B (Robbins Dep. 106:16-21).   In any event, he never bothered to get it.   *Id.* at 108:7-9.   Ms. Blummer's team leader did not realize she had been fired, and was told that she had been given the choice to resign, Ex. F (Corneillie Dep. 55:12-56:2), which was not true.

HR Director Lee cannot dispute that the accommodations Ms. Blummer was requesting might have taken care of the problems and deficiencies.   Ex. D (Lee Dep. 66:2-13).

Although Plaintiff would have been able to perform the essential job functions of her position with reasonable accommodations, Defendant refused her many requests for such accommodations.   The reasonable accommodation request

---

[14] Note that some of the things in Ms. Blummer's job description Ex. F (Corneillie Dep. Ex. 2 [USA 10]) were not critical, and in fact were never performed.   *Id.* at 30:21-31:4.   And there were new tasks added to her workload.   *Id.* at 31:20-32:11, 58:10-59:8.

[15] Defendant admitted that she was disciplined for "unprotected FMLA absences."   Ex. E (Alaniz Dep.32:19-33:2.)

process, which was undocumented and explained to Plaintiff several different ways, was not a good-faith effort by Defendant to engage in a flexible interactive process to determine whether, and what, accommodations would work for Plaintiff to perform her job duties.

In the end, Plaintiff was discharged because of her disability and need for reasonable accommodations, with no consideration to granting any of her many requests for accommodations.  Defendant did not consider Plaintiff's requests for accommodations in good-faith,[16] nor did it have any intention to accommodate her disability.

### III. SUMMARY OF ARGUMENT

Defendant mistakenly argues that *McDonell Douglas* applies to claims of failure to accommodate.  Instead, the elements of such claims include that Plaintiff had a disability, was qualified, Defendant knew of her disability, she requested an accommodation, one existed that would have worked, and Defendant failed to provide one.

Defendant cannot prove as a matter of law that the Plaintiff had no disability; if anything, as a matter of law she did.

---

[16] Shockingly, Ms. Blummer's manager stated that he felt the Defendant was "quite timely" in accommodating her.  Ex. B (Robbins Dep. 56:3-7).

Nor can Defendant prove that Plaintiff was unqualified as a matter of law. There are fact issues as to the essential job functions and the reasonableness of the accommodations sought.

Plaintiff made repeated attempts to engage in the flexible interactive process designed to find a reasonable accommodations, and Defendant admits that she was in good faith.  In contrast the Defendant squashed her every effort. The failure of the interactive process is squarely on the Defendant.

## IV. ARGUMENT AND AUTHORITIES

### A.    Summary Judgment Standard

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is appropriate where no rational trier of fact could find for the non-moving party in light of the record as a whole.  *Anderson v. Liberty Lobby, Inc.* 477 U.S. 144, 157 (1970).  However, when reviewing a motion for summary judgment, the court must make all factual inferences in favor of the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 975 (5th Cir. 1991).

"Doubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." *Evans v. City of Bishop,* 283 F.3d 586, 589 (5th Cir. 200) (internal quotations and citations omitted).

**B.     The *McDonnell Douglas* Burden-Shifting Formula Does Not Apply To Plaintiff's Failure-To-Accommodate Claims**

The Defendant mistakenly argues that the burden-shifting test set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), requires that the Plaintiff prove that she "was replaced by a non-disabled person or treated less favorably than non-disabled employees."  But as virtually every circuit to consider the question has held, *McDonnell Douglas* does not apply to ADA cases involving a failure to accommodate.  *See, e.g., Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007); *Davidson v. America Online, Inc.*, 337 F.3d 1179, 1188–1189 (10th Cir. 2003); *Fenney v. Dakota, Minnesota & Eastern R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999); *Walton v. Mental Health Ass'n of Southeastern Pennsylvania*, 168 F.3d 661, 670 (3d Cir. 1999); *Aka v. Washington Hosp. Center*, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc); *Williams v. Channel Master Satellite Systems, Inc.*, 101 F.3d 346, 348 n.1 (4th Cir. 1996), *cert. denied sub nom Williams v. Avnet, Inc.*, 520 U.S. 1240 (1997); *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1283–1284 (7th Cir. 1996); *Monette v.*

*Electronic Data Systems Corp.*, 90 F.3d 1173, 1180 (6th Cir. 1996). *See also Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006) (setting out elements of prima facie case in ADA failure-to-accommodate case); *Teahan v. Metro-North Commuter R. Co.*, 951 F.2d 511, 514–515 (2d Cir. 1991) (recognizing, in Rehabilitation Act case, that *McDonnell Douglas* may not apply if the employer admits taking disability or its manifestations into account);[17] *Reza v. IGT*, 2008 WL 2048357, at *2 (D. Nev. May 12, 2008); *Johnson v. Evangelical Lutheran Good Samaritan Society*, 2005 WL 2030834, at *8 (D. Or. Aug. 23, 2005).

The reason for rejecting the burden-shifting analysis in accommodation cases is both logical and obvious.  The *McDonnell Douglas* analysis was created to deal with the usual Title VII "pretext" case, in which the defendant denies taking the protected classification (e.g., race or gender) into account in its decision-making, and therefore no direct evidence of discrimination exists.  *Compare Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 n.8 (1981) ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").  By contrast, in cases involving

---

[17] Congress has mandated that the Rehabilitation Act and the ADA be read consistently, 42 U.S.C. § 12117(b), and that the ADA not be interpreted to provide lesser protection than does the Rehabilitation Act.  42 U.S.C. § 12201(a).  *See also Daugherty v. City of El Paso*, 56 F.3d 695, 697–698 (5th Cir. 1995) (applying Rehabilitation Act precedent in ADA cases).

the failure to accommodate, as in this one, the defendant is not really disputing that it took action based on disability.  *Compare Williams v. Channel Master Satellite Systems, Inc.*, 101 F.3d 346, 348 n.1 (4th Cir. 1996),[18] *cert. denied sub nom Williams v. Avnet, Inc.*, 520 U.S. 1240 (1997).  *See also Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173 (6th Cir. 1996).

The failure to accommodate is instead a direct violation of the law. *Bultemeyer*, *supra*, 100 F.3d at 1283.  Thus, there is no need to show pretext, and intent is generally not at issue.  *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004);[19] *Davidson v. America Online, Inc.*, 337 F.3d 1179, 1189 (10th Cir. 2003);[20] *Fontanilla v. City and County of San Francisco*, 2001 WL 513395, at *13

---

[18] In *Williams*, the court stated: "The district court improperly relied on a proof scheme based on the approach that the Supreme Court took in *McDonnell Douglas Corp. v. Green*. By readjusting burdens between the plaintiff and defendant, the *McDonnell Douglas* test is designed to circumvent a factual dispute over the reasons for discharge, and is therefore most appropriate when the defendant disavows any reliance on discriminatory reasons for its adverse employment action.  Here, the parties do not dispute that the reason that Channel Master did not permit Williams to return to her job was that her back injury prevented her from performing her assigned tasks without accommodation. The *McDonnell Douglas* inferential proof scheme is not appropriate when, as here, the reason for discharge is undisputed."  101 F.3d at 348 n.1 (citations and internal quotation marks omitted).

[19] The *Peebles* court stated: "Reasonable accommodation claims are not evaluated under the *McDonnell Douglas* burden-shifting analysis. Rather, a modified burden-shifting analysis is applied.  This is so because a claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive. The *McDonnell Douglas* line of cases, however, is aimed at fleshing out this elusive factual question of intentional discrimination." (citations and internal quotation marks omitted).

[20] The *Davidson* court stated: "If the employer admits that the disability played a prominent part in the decision, or the plaintiff has other direct evidence of discrimination based on disability, the burden-shifting framework may be unnecessary and inappropriate.  Instead, an employer will defend its decision on the ground that the plaintiff is not otherwise qualified for the position, with or without reasonable accommodation. The *McDonnell Douglas* burden shifting approach is unnecessary because the issue of the employer's intent has been admitted and the plaintiff has direct evidence of discrimination on the basis of his disability.  If the plaintiff in such a case is in fact statutorily disabled, the determinative issue in the case will not be the employer's intent, but whether the employee is otherwise qualified, with or without reasonable accommodation, to perform the job, a factual dispute that is resolved through traditional methods of proof." (citations and internal quotation marks omitted).

(N.D. Cal. Feb. 28, 2001). *See also Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454–455 (5th Cir. 2005) (ADA Title II case) ("[B]oth the ADA and the Rehabilitation Act impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals. Where a defendant fails to meet this affirmative obligation, the cause of that failure is irrelevant.").

Fifth Circuit precedent is to the same effect. In *Prewitt v. U.S. Postal Service*, 662 F.2d 292 (5th Cir. 1981) the court held that:

> even if Prewitt cannot so perform [the essential job duties], he might still be entitled to relief if he was a victim of "surmountable barrier" discrimination, i.e., if he was rejected even though he could have performed the essentials of the job if afforded reasonable accommodation. … Commentators have identified four distinct types of discriminatory barriers that handicapped persons must confront when seeking employment: 1. Intentional discrimination for reasons of social bias (racial, sexual, religion, handicap, etc.); 2. neutral standards with disparate impact; 3. surmountable impairment barriers; and 4. insurmountable impairment barriers. … The present complaints by Prewitt involve alleged "disparate impact" and a "surmountable barrier" handicap-discrimination. … The Title VII jurisprudence is, we believe, for the most part applicable to intentional social-bias discrimination against handicapped persons [citing *Burdine* and *McDonnell Douglas*]. … *Surmountable* and insurmountable *barriers raise issues that for the most part are peculiar to handicap discrimination*.

*Id*. at 305 n.19 (emphasis added).

Similarly, in *Rizzo v. Children's World Learning Centers, Inc*., 84 F.3d 758 (5th Cir. 1996), the court held that the district court had "improperly analyzed this case" because it was "not a circumstantial evidence case, where we apply the

*McDonnell Douglas* burden shifting framework; rather, this is a direct evidence

case." The court found:

> In the instant case there is direct evidence that [the employer] made an
> employment decision because of a disability. [The employer] does not
> deny that [the plaintiff] was removed from driving duties because of
> her hearing impairment. Therefore, we need not engage in the
> *McDonnell Douglas* presumptions in order to infer discrimination:
> [the employer] admits that it discriminated … [but] contends that it
> had a reason to discriminate [here, that the plaintiff posed a direct
> threat].

*Id.* at 762.

The instant court has also recognized that under analogous facts—i.e., where

the employer did not dispute adverse action but argued that plaintiff was not

"qualified" under the ADA and that the accommodations sought would result in a

fundamental alteration—such failure-to-accommodate claims are properly

analyzed as "direct evidence" cases rather than under *McDonnell Douglas* burden-

shifting. *E.E.O.C. v. Houston Area Sheet Metal Joint Apprenticeship Committee*,

2002 WL 1263893, at *6 and n.2 (S.D. Tex. May 31, 2002).[21]

---

[21] Even if the *McDonnell Douglas* analysis applied to this failure-to-accommodate claim, there is no hard and fast requirement for proof of replacement or less-favorable treatment. Instead, "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002), *quoting McDonnell Douglas*, 411 U.S. at 802 n.13. The Fifth Circuit law has recognized other formulations of this last prong. *E.g., Price v. Marathon Cheese Corp.*, 119 F.3d 330, 336–337 (5th Cir. 1997) (approving "otherwise discharged because of his age"); *Hebert v. Monsanto Co.*, 682 F.2d 1111, 1117 n.6 (5th Cir. 1982) ("after his rejection, the position remained open and the employer continued to seek applicants"); *Jimenez v. DynCorp Intern., LLC*, 635 F. Supp. 2d 592, 607 (W.D. Tex. 2009) (holding replacement "not outcome determinative," and recognizing "otherwise discharged because of his race"). *See also Grace v. Potter*, 2006 WL 1207735, at *3 n.13 (S.D. Tex. May 3, 2006) (J. Stephen W. Smith) (Title VII case; citation omitted) ("These elements are sometimes referred to as a 'prima facie case', but that terminology invites confusion. The components of a McDonnell Douglas-type prima facie case are variable, and do not

The implicit reason behind the formulation Defendant urges—that Plaintiff must prove replacement by, or less-favorable treatment than non-disabled employees— is inferring discrimination from differing treatment.   But by definition, the plaintiff in an accommodation case is *seeking* to be treated differently, as the law mandates.   As the Supreme Court recognized in *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002), the ADA specifies that

> preferences will sometimes prove necessary to achieve the Act's basic equal opportunity goal. The Act requires preferences in the form of "reasonable accommodations" that are needed for those with disabilities to obtain the same workplace opportunities that those without disabilities automatically enjoy. By definition any special "accommodation" requires the employer to treat an employee with a disability differently, i.e., preferentially. And the fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach.

The Fifth Circuit has recognized the same thing:

> The ADA mandate that employers must accommodate sets it apart from most other anti-discrimination legislation. Race discrimination statutes mandate equality of treatment, in most cases prohibiting consideration of race in any employment decision. In contrast, an employer who treats a disabled employee the same as a non-disabled employee may violate the ADA. By requiring reasonable accommodation, the ADA shifts away from similar treatment to different treatment of the disabled by accommodating their disabilities.

_____

apply to all discrimination cases across the board."). The law in other circuits is the same. *See, e.g., Leffel v. Valley Financial Services*, 113 F.3d 787, 793–794 (7th Cir. 1997) (observing that disparate treatment is not the only basis for inferring discrimination, and adopting "circumstances surrounding her probation and discharge indicate that it is more likely than not that her disability was the reason for these adverse actions;"); *Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 939–940 (3d Cir. 1997) (clarifying that the fact that circuit precedent repeats a particular formulation does not mean that it is always required).

*Riel v. Electronic Data Systems Corp.*, 99 F.3d 678, 681 (5th Cir. 1996).  Thus, any prima facie model that requires proof of differing treatment is inapposite in the ADA failure-to-accommodate context.

## C.    The True Elements of an ADA Failure-To-Accommodate Claim

Rather than attempting to force the "square peg" of an accommodation claim into the "round whole" of the *McDonnell Douglas* disparate treatment model, the court should simply focus on the actual elements of an ADA claim of failure to accommodate. Those elements are that the plaintiff 1) has a disability; 2) was qualified for the position; and 3) was discriminated against because of his disability.  *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007); *LeBlanc v. Lamar State College*, 232 S.W.3d 294, 299 (Tex. App.–Beaumont 2007, no writ).[22]    Discrimination includes failing to provide a reasonable accommodation.   42 U.S.C. § 12112(b)(5)(A); *Riel v. Electronic Data Systems Corp.*, 99 F.3d 678, 681 (5th Cir. 1996); *LeBlanc*, *supra*, 232 S.W.3d at 299, *citing* Tex. Lab. Code § 21.128(a).

The Fifth Circuit's Pattern Jury Charge § 11.7.2(B)(4) sets out the details. To prove a failure-to-accommodate claim under the ADA, the plaintiff must prove:

a. Plaintiff had a disability;
b. Plaintiff was qualified for the job;
c. Defendant knew of Plaintiff's disability;

---

[22] *But cf. Miles-Hickman v. David Powers Homes, Inc.*, 589 F. Supp. 2d 849, 858 n.15 (S.D. Tex. 2008).

d. Plaintiff requested an accommodation;
e. A reasonable accommodation existed that would have allowed Plaintiff to perform the essential functions of the job; and
f. Defendant failed to provide a reasonable accommodation.

Numerous cases in this Circuit use those, or substantially similar, elements. *See, e.g., Cato v. First Federal Community Bank*, ___ F. Supp. 2d ___, 2009 WL 3733358, at *11 (E.D. Tex. Nov. 5, 2009) ("To assert a claim under the ADA's accommodation provisions, Plaintiff must show: (1) she requested a reasonable accommodation; and (2) that she was a qualified individual with a disability at the time the request for accommodation was made. … Once such a request is made, the employer is required to engage in an "interactive process: a meaningful dialogue with the employee to find the best means of accommodating that disability. … When an employer does not engage in a good faith interactive process, that employer violates the ADA-including when the employer discharges the employee instead of considering the requested accommodations.") (internal quotes omitted); *Gary v. Combined Group Ins. Services, Inc.*, 2009 WL 2868485, at *12 (N.D. Tex. Sept. 4, 2009) ("To establish a claim for failure to accommodate, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability. As to the third element, the ADA requires that the employer and employee engage in an interactive process to determine a reasonable accommodation.") (cite and internal quotes omitted); *Hartup v. American*

59

*Standard, Inc*., 2009 WL 2776386, at *12 (N.D. Tex. Aug. 31, 2009) (plaintiff "must prove that: (1) He had a disability; (2) he was qualified for the job; (3) Defendant knew of his disability; (4) [the plaintiff] requested an accommodation; (5) a reasonable accommodation existed that would have allowed him to perform the essential functions of the job; and (6) Defendant failed to provide a reasonable accommodation."); *Fields v. St. Bernard Parish School Bd*., 2000 WL 335744, at *5 (E.D. La. March 30, 2000) (elements are "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.").

The law in other circuits is likewise similar. *See, e.g., Ekstrand v. School Dist. of Somerset*, 583 F.3d 972, 975 (7th Cir. 2009); *Enica v. Principi*, 544 F.3d 328, 338 (1st Cir. 2008); *Graves v. Finch Pruyn & Co., Inc*., 457 F.3d 181, 184 (2d Cir. 2006); *Armstrong v. Burdette Tomlin Memorial Hosp*., 438 F.3d 240, 246 (3d Cir. 2006); *Bartee v. Michelin North America, Inc*., 374 F.3d 906, 912 n.4 (10th Cir. 2004); *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001), *cert. denied*, 535 U.S. 933 (2002); *Penny v. United Parcel Service*, 128 F.3d 408, 414 (6th Cir. 1997); *Nighswander v. Henderson*, 172 F. Supp. 2d 951, 962–963 (N.D.

Ohio 2001); Ninth Circuit Model Civil Jury Instructions, § 12.8 (ADA—Reasonable Accommodation), linked online at http://207.41.19.15/web/sdocuments.nsf/civ.

## D.     The Burdens of Proof in a Failure-to-Accommodate Claim

The Supreme Court set out the proper burdens of proof in accommodation cases in *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).   According to the Court, to defeat an employer's motion for summary judgment, the plaintiff "need only show that an 'accommodation' seems reasonable on its face, i.e., ordinarily or in the run of cases.  Once the plaintiff has made this showing, the []employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances."  *Id*. at 401–402 (citations omitted).  *See also Riel v. Electronic Data Systems Corp*., 99 F.3d 678, 682–683 (5th Cir. 1996).[23]

## E.     Analysis in Similar Cases

The proper analysis in this case is seen by reference to factually similar cases like *Holly v. Clairson Industries, L.L.C*., 492 F.3d 1247 (11th Cir. 2007).  In *Holly*, the employer stopped accommodating the plaintiff's frequent disability-related tardiness pursuant to its "no-fault" punctuality policy.  The district court

---

[23] The Fifth Circuit has previously explained that "the burden of proving inability to accommodate is upon the employer. … The employer has greater knowledge of the essentials of the job than does the handicapped applicant. The employer can look to its own experience, or, if that is not helpful, to that of other employers who have provided jobs to individuals with handicaps similar to those of the applicant in question. Furthermore, the employer may be able to obtain advice concerning possible accommodations from private and government sources." *Prewitt*, *supra*, 662 F.2d at 308.

granted summary judgment to the employer on grounds similar to those urged by the Defendant in the instant case, finding that strict punctuality was an "essential function" of the plaintiff's job, and that the plaintiff was not the victim of unlawful discrimination because there was no evidence that the employer had treated him differently from similarly-situated non-disabled employees.   The appellate court reversed, observing that:

> an employer's failure to reasonably accommodate a disabled individual itself constitutes discrimination under the ADA, so long as that individual is "otherwise qualified," and unless the employer can show undue hardship. There is no additional burden on [plaintiff] to show that [the employer] enforced its punctuality policy in a discriminatory manner by granting leniency under the policy to [plaintiff's] non-disabled co-workers while denying [plaintiff] the same leniency, nor any subsequent burdens on [the employer] to show that it had "any legitimate non-discriminatory reasons for terminating [plaintiff]" or on [the plaintiff] to "establish that these reasons were pretextual."

Thus the instant Defendant's reliance on the *McDonnell Douglas* burden-shifting formula simply misses the point.   Rather, as in *Holly*, Ms. Blummer does not dispute that she came in tardy on occasion, but argues instead that strict punctuality is not an essential function of her particular job.   As the Eleventh Circuit held in *Holly*, and as shown below at pp. 74–78, there is a fact issue as to whether such strict punctuality is an essential function in this case, and summary judgment should be denied.

**F.      Defendant Is Not Entitled To Summary Judgment On Disability**

As set out at pages 10–41 of the Plaintiff's Motion for Partial Summary Judgment, Doc. No. 30 on file herein (and hereafter "Plaintiff's Motion"), the facts in the instant case establish disability as a matter of law.   In the event the Court disagrees, at the very least those facts present a question for the jury.   To avoid duplication, Plaintiff's Motion is adopted by reference, pursuant to Fed. R. Civ. Proc. 10(c), and simply summarized below.

As summarized in Plaintiff's Motion at 3–5, Ms. Blummer has been diagnosed with McCune-Albright Syndrome accompanied by Polyostotic Fibrous Dysplasia since about age fifteen.   Because of these disorders, she experiences markedly weakened bones, multiple and repeated bone fractures, and deformity of the legs, arms, and skull.   The Polyostotic Fibrous Dysplasia disorder characterized in people with McCune-Albright Syndrome results in constant pain, micro and macro fractures of bone, bone deformity and constant reproduction of bone tissue. Her femur and hip bones are primarily affected by this disorder.   In fact, Ms. Blummer's right femoral neck has broken so many times that her right leg is approximately four centimeters shorter than her left.   As a result of this disorder, she experiences great pain on a chronic basis.   She is substantially limited in a variety of major life activities, including walking, lifting, standing, pushing, running, and working.   She cannot walk for more than a couple of blocks without a

lot of pain, and without risking even greater pain and further serious injury.  She also walks with a severe limp, and often uses a forearm crutch (or occasionally a wheelchair) for assistance.  Ms. Blummer's impairment also affects her ability to lift objects.  She cannot lift more than ten to fifteen pounds without running the risk of experiencing even greater pain and further injury.  She is similarly restricted in standing, pushing, cannot run a single step, and has only ever done sedentary work.

### 1.    Plaintiff's Evidence of Disability

As shown in Plaintiff's Motion, Ms. Blummer has an actual disability as defined by the ADA, 42 U.S.C. § 12102(1)(A), in that she has a physical impairment that substantially limits a major life activity.

### a.    Proof of Impairment

Ms. Blummer has a physiological disorder or condition that affects her musculoskeletal system—McCune-Albright Syndrome and resulting Polyostotic Fibrous Dysplasia, which is described and cited in detail in the Plaintiff's Motion at 10–17, and which weakens her bones tremendously.

### b.    Proving a Substantial Limitation

Although "substantial" means considerable, or to a large degree, *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 491 (1999), an impairment need not rise to the level of an "utter inability" in order to be substantially limiting.  *Chevron Phillips*,

570 F.3d at 619.  A person is substantially limited in a major life activity if he or she is significantly restricted in the condition, manner or duration of performing the activity as compared to the average person in the general population.  29 C.F.R. § 1630.2(j)(1)(ii); *McInnis v. Alamo Community College Dist.*, 207 F.3d 276, 280 (5th Cir. 2000).  In determining whether an impairment is substantially limiting, the following factors are considered: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact of the impairment.  29 C.F.R. § 1630.2(j)(2).

c.   Plaintiff's Substantial Limitation in Walking

Under the ADA, walking is a major life activity.  29 C.F.R. § 1630.2(i); *E.E.O.C. v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 730 (5th Cir. 2007). The undisputed evidence in this case, described and cited in Plaintiff's Motion at 18–30, shows that Ms. Blummer has a disability because she is substantially limited in walking for a variety of independently sufficient reasons—the severe restrictions on the time and distance she can walk, the pain she experience on walking, the risk of injury from her walking, the incurable and permanent nature of her condition, and the severe limp she has when she does walk.

d.   Plaintiff's Substantial Limitation in Lifting

Lifting is a major life activity.  29 C.F.R. Part 1630 App. § 1630.2(h); *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007).  As shown in

Plaintiff's Motion at 30–32, Ms. Blummer is restricted from lifting more than ten to 15 pounds, which is a significant restriction that equals or exceeds restrictions found to be substantially limiting by numerous courts.

    e.    <u>Plaintiff's Substantial Limitation in Standing</u>

Ms. Blummer is also substantially limited in standing, and cannot stand more than ten or fifteen minutes without pain.  This is significantly different that the average person's abilities, and as shown above such temporal restrictions are substantially limiting.

    f.    <u>Plaintiff's Substantial Limitation in Pushing</u>

As shown in Plaintiff's Motion at 32–34, pushing fits in the definition of a major life activity, i.e., a basic activity that the average person in the general population can perform with little or no difficulty, and Ms. Blummer is substantially limited in her ability to push.

    g.    <u>Plaintiff's Substantial Limitation in Running</u>

As shown in Plaintiff's Motion at 34–36, running also fits in the definition of a major life activity, and has been recognized by one by numerous courts, including the Supreme Court.  The evidence is both clear and uncontested in this case that Ms. Blummer cannot run at all, not even to jog, not even a single step. Thus, she has a disability as a matter of law because running is a major life activity.

h.     Plaintiff's Substantial Limitation in Working

Working is a major life activity under the ADA.  *E.E.O.C. v. R.J. Gallagher Co.*, 181 F.3d 645, 654–655 (5th Cir. 1999).  A substantial limitation in working means a significant restriction in the ability to perform either a class of jobs, or a broad range of jobs in various classes, as compared to the average person having comparable training, skills and abilities.  29 C.F.R. § 1630.2(j)(3)(i).  In addition to the "condition, manner, and duration" factors listed above, the court may also consider various vocational factors.   29 C.F.R. § 1630.2(j)(3)(ii).  As shown in Plaintiff's Motion at 36–41, and in the Report of Plaintiff's Vocational Expert, Ms. Blummer is precluded from many jobs her own career field, which is a class of jobs, and from several broad classes of jobs that require physical labor, based on the limitations imposed by her treating physician as a result of her medical conditions.  Ms. Blummer's impairments exclude her from over 95% of available jobs.  There was no contrary testimony, and this meets or exceeds the limitations on working found to be substantially limited in numerous other cases.

## 2.     Errors and Inadequacy in Defendant's Arguments About Disability

Defendant makes three arguments about disability, and each is wrong—it recognizes that mere reliance on another case involving a similar diagnosis is inappropriate, and then it does exactly that; it mistakenly relies on the things that the Plaintiff is able to do rather than focusing on the major life activities in which

she is substantially limited; and it indulges all inferences in its own favor in contravention to the lawful summary judgment standard.

Under the ADA, disability requires an individualized assessment, *E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 620 (5th Cir. 2009), and must be assessed on a case-by-case basis. *Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468, 481–482 (5th Cir. 2006). Because of this, disability must be assessed without overreliance on disability determinations made in prior cases. *McInnis v. Alamo Community College Dist.*, 207 F.3d 276, 281 (5th Cir. 2000). *See also Emory v. AstraZeneca Pharmaceuticals LP*, 401 F.3d 174, 182 (3d Cir. 2005) ("[E]ven if two different plaintiffs alleging substantial limitations suffer from the same impairment, the nuances of its effect on their daily lives will invariably manifest themselves in distinct ways."); *Joffer v. Premier Bankcard Inc.*, 2008 WL 2371149, at *7 (D.S.D. 2008) ("[A] conclusion that a certain condition, or particular manifestation of a condition, does not substantially limit a particular plaintiff does not foreclose a determination that another individual with the same or analogous condition may be disabled within the meaning of the ADA.") (internal quotes omitted); *Street v. Ingalls Memorial Hosp.*, 2008 WL 162761, at *6 (N.D. Ill. Jan. 17, 2008) ("Although the Seventh Circuit has considered a broken leg to be a non-chronic impairment with little or no long term impact, a court's assessment of whether an individual is disabled within the

meaning of the ADA is fact-specific. … Here, Street has presented evidence that during the relevant time period she was restricted to walking no more than 100 to 300 feet at a time with the assistance of either a wheelchair, walker, or cane. She has also presented evidence that she has a permanent restriction in … her knee's range of motion and that her injured leg is one centimeter shorter than her other leg.").

Defendant pays lip-service to this rule, admitting that "determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual."[24]   Yet Defendant spends only about three pages discussing Plaintiff's condition and limitations, and half of that space simply cites to a single case finding a similar diagnosis did not rise to the level of disability, *Boyar v. YMCA of Norwalk, Inc.*, 2008 WL 1743496 (D. Conn. April 15, 2008).   And the facts in *Boyar* are shockingly different.   In that case the court observed that Boyar

> has worked for over a decade as a fitness instructor without
> accommodation, climbs stairs to and from her second floor apartment,
> and exercises three to four days a week using an elliptical trainer and
> occasionally a treadmill. In addition, the record establishes that after
> her employment with the defendant was terminated, she sought
> employment as a fitness teacher who needed no accommodation,

---

[24] Defendant's Motion, at 24, *quoting Taylor v. The Principal Financial Group, Inc.*, 93 F.3d 155, 164 (5th Cir.), *cert. denied*, 519 U.S. 1029 (1996).

> stating that she "couldn't imagine what jobs [she] wouldn't apply for
> because of [her] physical condition."

*Id*. at *1.  Needless to say, there is no such evidence in the instant case.

Moreover, the Defendant fails to point out the contrary case law, holding that the *Boyar* diagnosis (brittle-bone disease) supported a jury verdict for plaintiff in *Dadian v. Village of Wilmette*, 269 F.3d 831, 837–838 (7th Cir. 2001) (sufficient evidence for jury to decide that ADA plaintiff's osteoporosis was a disability in light of evidence it caused fractures and joint disease and resulted in problems walking).  *See also E.E.O.C. v. Convergys Customer Management Group, Inc*., 491 F.3d 790 (8th Cir. 2007) (affirming verdict for plaintiff in another brittle-bone case in which it appears the employer stipulated disability); *Welther v. Bowen*, 1987 WL 13975 (N.D. Ill. July 15, 1987) (severe osteoporosis with microfractures may be a disability for Social Security purposes because of resulting pain).[25]

Simply citing another case with a similar diagnosis cannot support a finding that the plaintiff has no disability as a matter of law.  On the other hand, the fact there is contrary authority at a minimum suggests a factual dispute for the jury. *Compare Desmond v. Mukasey*, 530 F.3d 944, 957 (D.C. Cir. 2008) ("That courts have reached conflicting conclusions in the face of similar claims reinforces our

---

[25] Note that a Social Security determination of disability, although not dispositive, is evidence of an ADA disability.  *Lawson v. CSX Transp., Inc*., 245 F.3d 916, 927 (7th Cir. 2001); *Gonzales v. Columbia Hosp*., 2002 WL 31245379, at *3 (N.D. Tex. Oct. 1, 2002).

belief that borderline cases like this turn on fact questions best left to juries rather than to judges ruling on summary judgment.").

The Defendant commits another marked error in its disability analysis when it spends nearly half a page listing some of the things that the Plaintiff *can* do. This is simply beside the point, and is a tip-off that the Defendant misunderstands the law.  The focus is not on all of the things that the plaintiff can do, but rather on those activities that she cannot do, or is substantially limited in doing.  *See, e.g., E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 619 (5th Cir. 2009) (ability to work does not mean plaintiff did not have a disability); *Emory v. AstraZeneca Pharmaceuticals LP*, 401 F.3d 174, 180–181 (3d Cir. 2005) ("The District Courts focus on what Emory has managed to achieve misses the mark. While evidence of tasks he has mastered might seem to serve as a natural counterpoint when evaluating disability, the paramount inquiry remains—does Emory 'have an impairment that prevents or severely restricts [him] from doing activities that are of central importance to most people's daily lives?'"); [26] *Belk v. Southwestern Bell Telephone Co.*, 194 F.3d 946, 950 (8th Cir. 1999) ("SWB points out that Belk himself admitted at trial that he coaches Little League, hunts, fishes, and has built a garage and an addition to his home. We reject SWB's argument. … In this case, it can hardly be disputed that Belk is disabled in the major life activity

---

[26] *Emory* was cited favorably in *E.E.O.C. v. Chevron Phillips*, *supra*, 570 F.3d at 619.

of walking. The full range of motion in his leg is limited by the brace, and his gait is hampered by a pronounced limp.");[27] *Lehman v. U.S. Steel Corp.*, 2007 WL 2728659, at *5 (W.D. Pa. Sept. 17, 2007) ("What Plaintiff is capable of doing, however, is not relevant to the inquiry here. Simply because a Plaintiff can complete some tasks does not mean that he is not disabled pursuant to the ADA. Indeed, even though Plaintiff is clearly not completely disabled as to all facets of his life, the Court must conduct the inquiry outlined above to determine whether Plaintiff is substantially limited in one or more major life activities."); *Carter v. Northwest Airlines, Inc.*, 2003 WL 403131, at *3 (N.D. Ill. Feb. 20, 2003), *judgment aff'd*, 93 Fed. Appx. 944 (7th Cir. 2004) ("Northwest places great importance on Carter's ability to drive to a health club, sit in the hot tub, swim in the pool, use an upper body weight lifting machine, and ride a stationary bike. But these activities are not relevant to whether Carter's impairment substantially limits his ability to walk."). *See also Gillen v. Fallon Ambulance Service, Inc.*, 283 F.3d 11, 22 (1st Cir. 2002) ("The key question is not whether a handicapped person accomplishes her goals, but whether she encounters significant handicap-related obstacles in doing so.").[28]   Otherwise the ADA would be inapplicable to those individuals most likely to have the capacity to perform various jobs capably if

---

[27] In analyzing Texas law on what constitutes a substantial limitation in walking, the Texas Supreme Court cited *Belk* favorably in *Little v. Texas Dept. of Criminal Justice*, 148 S.W.3d 374, 384 (Tex. 2004).

[28] *Gillen* likewise was cited favorably in *E.E.O.C. v. Chevron Phillips*, *supra*, 570 F.3d at 619.

provided with reasonable accommodations. *Finical v. Collections Unlimited, Inc.*, 65 F. Supp. 2d 1032, 1038–1039 (D. Ariz. 1999).

The Defendant also improperly indulges all inferences in its own favor. For example, it characterizes Plaintiff's testimony as simply reflecting the inability to walk "for long periods of time without crutches." But as shown above p. 65, and in Plaintiff's own Motion, the Plaintiff has established, and without dispute, that she is substantially limited in walking.[29]

For all of the above reasons, Ms. Blummer is a person with a disability under the law.

## G.    Defendant is not entitled to Summary Judgment on "Qualified"

The plaintiff is qualified if, with or without reasonable accommodation, she could perform the essential functions of the position she held. 42 U.S.C. § 12111(8); *Riel v. Electronic Data Systems Corp.*, 99 F.3d 678, 682 (5th Cir. 1996).

### 1.    Essential Job Functions

The essential job functions are "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. §

---

[29] It also claims that Plaintiff admitted the ability to climb into the cockpit of a T-45 jet, without also acknowledging that she did not enter the cockpit, and climbed onto the plane only with difficulty and with help from others. Defendant's Exh. A, 207:7–13. The photographs that Defendant attaches confirm the help Plaintiff had in getting up to pose for a picture. Defendant refers to one photograph as showing her putting "all of her weight on her right leg," when in fact that picture shows her supporting her weight on both arms and on her left knee, and being aided by a friend. More to the point, Plaintiff does not claim that she is substantially limited in climbing, and neither her testimony nor any photographs show anything about the Plaintiff's ability to walk, stand for any length of time, lift, work, etc.

1630.2(n)(1); *Riel, supra*, 99 F.3d at 682.[30]   In determining whether a function is essential, courts must assess, among other things, the employer's judgment as to which functions are essential; written job descriptions; the amount of time spent on the job performing the function; the consequences of not requiring the incumbent to perform the function; the terms of a collective bargaining agreement; the work experience of past incumbents in the job; and/or the current work experience of incumbents in similar jobs.  29 C.F.R. § 1630.2(n)(2); *Riel, supra*, 99 F.3d at 682–683.  A job function may be considered essential, for example, if the reason the position exists is to perform that function; there are a limited number of employees available among whom the performance of that job function can be distributed; or the function is highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.  29 C.F.R. § 1630.2(n)(3).

## 2.    Essential Job Functions are a Fact-Intensive Inquiry

Given such an analysis, the assessment of whether a function is essential is a fact-intensive one.  As the Fifth Circuit recognized in *Barber v. Nabors Drilling U.S.A., Inc*. 130 F. 3d 702, 707 (5th Cir. 1997):

> First, we cannot say, on the facts of this case, that any or all of the above listed … duties as a matter of law are essential functions …. If

---

[30] According to the Defendant, the "sole issue in this case" is the reasonableness of one accommodation sought.  Motion at p.1.  It thus appears that the Defendant does not dispute that the Plaintiff can perform the essential job functions, but Plaintiff briefs the issue because Defendant appears to do so in certain ways.

> we venture to second-guess then we simply usurp the most critical
> function of the jury in ADA cases, i.e., the injection of some
> indispensable common sense in the determination of what is or is not
> an essential function. When a statutory scheme such as the ADA
> necessitates some seemingly arbitrary line-drawing exercise, courts of
> law do well to refer the question to the jury, and consequently the
> appellate court must respect the jury's call, unless it is unsupportable
> by the evidence.

*See also Riel, supra*, 99 F.3d at 682–683 (finding question of fact); *Rohr v. Salt*

*River Project Agricultural Imp. and Power Dist.*, 555 F.3d 850, 864 (9th Cir.

2009); *Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1258 (11th Cir. 2007)

(whether a function is essential is evaluated on a case-by-case basis by examining a

number of factors).

Defendant can only prevail under the above analysis by showing that strict

punctuality, working a fixed or rigid schedule, and performing all job duties at 600

Gemini in Houston, are all essential job functions.  None of those meets any of the

three regulatory examples of essential job functions in § 1630.2(n)(3), of course.

Nor do the regulatory factors in § 1630.2(n)(2) indicate any of them are essential.

With regard to strict punctuality or a rigid schedule, the Defendant has no set

policy as to scheduled hours, and it allows numerous other employees to have a

flexible schedule, as shown above on pp. 17–18.[31]   Moreover, neither the

---

[31] The fact that the employer allowed others to avoid performing the function in the past suggests it is not essential.  *See, e.g., Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 991 (9th Cir. 2007) (en banc) (DOT standards were not essential job functions because employer permitted exceptions to them for others); *Taylor v. Rice*, 451 F.3d 898, 906–907 (D.C. Cir. 2006) (fact that State Department did not require "worldwide availability" for all employees suggests that it was not an essential function); *Blockel v. J.C. Penney Co., Inc.*,

Defendant's job description, Ex. F (Corneillie Dep. Exh. 2 [USA 10-11]) , nor the

Defendant's job summary and qualifications, *Id.* at Exh. 1 [USA 460-467], indicate

any particular work schedule for Ms. Blummer's position.[32]  It is also worth noting

that other employers in the space industry permit it, as was done for Plaintiff both

before and after her tenure with Defendant.  Ex. A (Blummer Aff. 12-13); Ex. H

(Blummer Dep. 45:17 – 23, 49:11-17).

Defendant's only assertion as to *how and why* strict punctuality or a rigid

schedule would be an essential duty is a reference to the need for Plaintiff to

"support" certain meetings.  Motion at p. 31.  But Defendant does not explain how

or why Plaintiff's *physical presence* at those meetings was essential.  In fact, all of

the evidence is to the contrary, as shown in pp. 18–20 above.

Instead of evidence, Defendant urges this Court to ignore the above Fifth

Circuit precedent and short-circuit the required analysis in favor of what is in

essence an invitation to adopt an extra-statutory, *per se* defense.  Implying such a

defensive theory into the statute is wrong, of course, but the particular theory

asserted here is also inapposite.

Defendant's position is simply to cite opinions that have characterized

*attendance* as an essential job function of most jobs.  *See, e.g., Rogers v. Int'l*

---

337 F.3d 17, 26 (1st Cir. 2003).

[32]  The fact that a function alleged by the employer to be essential does not appear in the job description suggests a fact issue.  *See, e.g., Giles v. General Elec. Co.*, 245 F.3d 474, 486 (5th Cir. 2001); *E.E.O.C. v. E.I. DuPont de Nemours*, 347 F. Supp. 2d 284, 296 (E.D. La. 2004), *aff'd in relevant part*, 480 F.3d 724, 730–731 (5th Cir. 2007); *Vaughn v. Federal Exp. Corp.*, 1997 WL 625495, at 83 (E.D. La. Oct. 7, 1997).

*Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996).  Of course, the Fifth

Circuit has never held that attendance is *always* an essential job function.[33]

*Rogers*, for example, was about the plaintiff's inability to work *at all*.[34]

Defendant's view is also contrary to other case law, and to EEOC guidance.

See EEOC Enforcement Guidance: Reasonable Accommodation and Undue

Hardship Under the Americans with Disabilities Act, Question 22 and n. 65 (Oct.

2002, Revised), http://www.eeoc.gov/policy/docs/accommodation.html  (attendance

"is not an essential function as defined by the ADA because it is not one of the

fundamental job duties of the employment position. As the regulations make clear,

essential functions are duties to be performed.") (internal citations  and quotations

omitted).[35]

More to the point, much of this case is about strict punctuality or rigid work

schedules, not attendance.  *See, e.g., Holly v. Clairson Industries, L.L.C.*, 492 F.3d

1247 (11th Cir. 2007) (making distinction between attendance and punctuality).

The rest involves the location from which work is performed, not the inability to

---

[33] That makes sense given that accommodations include reasonable periods of leave, 29 C.F.R. Part 1630 App., § 1630.2(o); *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 647 (1st Cir. 2000) (trial court's statement about attendance being an essential function of any job suggests "per se rules" rather than the required "individual assessment of the facts that the Act and the case law requires"); and, as shown in pp. 18–19 below, teleworking.

[34] Other cases like *Hypes v. First Commerce Corp.*, 134 F.3d 721, 726–727 (5th Cir. 1998), actually reflect a detailed factual analysis of the particular circumstances, an approach Defendant eschews here.

[35] The EEOC guidance is the more logical position in that most such cases actually turn, not on what job duties are essential, but on the accommodation issue.  That is, in cases like *Rogers*, the court was not really determining which functions were essential so much as it was finding that indefinite leave was either an unreasonable accommodation, or perhaps more appropriately, would have imposed an undue hardship.

work at all, as in *Rogers*. There are numerous cases finding a fact issue on such matters. *See, e.g., Holly v. Clairson Indust., L.L.C.*, 492 F.3d 1247, 1257–1260 (11th Cir. 2007) (fact issue whether strict punctuality was an essential job function because of the nature of the job, the lack of hard evidence, and the fact that the employer had previously accommodated instances of tardiness); *Ward v. Massachusetts Health Research Institute, Inc*., 209 F.3d 29, 35 (1st Cir. 2000) ("We find nothing in the record to support the appellee's position that a set schedule is an essential requirement for Ward's job ... [or] any evidence that the nature of Ward's position requires that he be present during specific hours of the day. In fact, the record suggests otherwise."); *Carlson v. Inacom Corp*., 885 F. Supp. 1314, 1320 (D. Neb. 1995) (levels of attendance and regularity is a fact-specific issue dependent upon the job); *Breen v. Dept. of Transp.,* 282 F.3d 839, 842–843 (D.C. Cir. 2002) (fact dispute regarding whether daily attendance was required, and thus whether it would preclude alternative work schedule providing biweekly day off).

### 3.    Reasonable Accommodation

The ADA prohibits discrimination, defined as including an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified ... employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its]

business." 42 U.S.C. § 12112(b)(5)(A); *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 396 (2002).  The Act defines reasonable accommodation as including "job restructuring" and "modified work schedules." 42 U.S.C. § 12111(9)(B).  The plaintiff's burden on reasonableness is simply to show that the accommodation "need only show that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *Barnett*, *supra*, 535 U.S. at 401.

a.    Flexible Schedule

The flexible schedule Plaintiff sought is a modified work schedule on the statutory list, and thus satisfies her burden of production[36] at this stage.  Moreover, "the reasonableness of an accommodation is generally a question of fact inappropriate for resolution on summary judgment."  *McCoy v. Texas Dept. of Criminal Justice*, 2006 WL 2331055, at *9 (S.D. Tex. Aug. 9, 2006) (collecting authorities).   Other courts have found sufficient evidence that schedule modifications are reasonable.  *See, e.g., Ward v. Massachusetts Health Research Institute, Inc.*, 209 F.3d 29, 36 (1st Cir. 2000) ("We decline to hold that the flexible schedule Ward proposes is per se unreasonable. The ADA explicitly states that 'job restructuring' and 'part-time or modified work schedules' are potential reasonable accommodations. Nothing in that explicit language implies that a modified schedule must be regular or predictable. Therefore, MHRI must submit some

---

[36] *Barnett*, *supra*, 535 U.S. at 402, *citing Borkowski v. Valley Central School Dist.*, 63 F.3d 131, 138 (2d Cir. 1995).

evidence in support of its position that the requested accommodation would impose undue hardship. However, rather than produce evidence that a flexible schedule would present 'significant difficulty or expense,' MHRI has offered only general statements …") (citations and footnotes omitted); *Norden v. Samper*, 503 F. Supp. 2d 130, 153 (D.D.C. 2007) ("a flexible work schedule to account for her physical limitations, especially her propensity to experience severe migraines … [was a] categorically reasonable request."); *Hasty v. Integra Bank Corp.*, 2004 WL 3315373, at *7 (S.D. Ind. Nov. 23, 2004) ("flexible work schedule that permitted her to attend doctor's appointments and to work her schedule around the periods of fatigue associated with her [condition]," and making up her hours by coming in at other times or working from home).

*See also Mark v. Burke Rehab. Hosp.*, 1997 WL 189124, at *5 (S.D.N.Y. April 17, 1997) ("Modifying when a job is performed is a 'reasonable accommodation' under the ADA."); 29 C.F.R. Part 1630 App., § 1630.2(o) ("an essential function customarily performed in the early morning hours may be rescheduled until later in the day").

EEOC guidance is also consistent. *See, e.g.,* EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, *supra* at Question 22 ("A modified schedule may involve adjusting arrival or departure times … [and an] employer must provide a modified

or part-time schedule when required as a reasonable accommodation, absent undue hardship, even if it does not provide such schedules for other employees."); Questions and Answers About Cancer in the Workplace and the Americans with Disabilities Act (ADA), at Question 3 (EEOC Aug. 3, 2005), http://www.eeoc.gov/facts/cancer.html ("flexible working hours to receive or recover from treatment"); *id*. at Question 11 (employer should consider whether it could provide a flexible schedule, e.g., later start time or part-time schedule, to accommodate engineer undergoing radiation for cancer);  Questions and Answers About Epilepsy in the Workplace and the Americans with Disabilities Act (ADA), Question 14 (EEOC Aug. 24, 2004), http://www.eeoc.gov/facts/epilepsy.html ("an employer may have to provide a flexible work schedule or allow the employee breaks to rest or to take medication to keep her epilepsy under control.").

  b.  Teleworking

  Defendant also asks the Court to adopt another extra-statutory per se rule that teleworking is never a reasonable accommodation.  Again, such an argument is not only inconsistent with the plain language of the ADA, it is inconsistent with substantial authority.  *See, e.g., Humphrey v. Memorial Hospitals Ass'n,* 239 F.3d 1128, 1136–1137 (9th Cir. 2001) ("there is at least a triable issue of fact as to whether Humphrey would have been able to perform the essential duties of her job with the accommodation of a work-at-home position"); *Langon v. HHS*, 959 F.2d

1053 (D.C. Cir. 1992) (allowing computer programmer to work at home may be reasonable accommodation); *Niimi-Montalbo v. White*, 243 F. Supp. 2d 1109, 1125 (D. Haw. 2003) (denying summary judgment on whether working from home was reasonable); *Davis v. Guardian Life Ins. Co. of Am.*, 2000 WL 1848596, at *6 (E.D. Pa. Dec. 15, 2000) (granting employee ability to work from home three days a week as an accommodation); *Hernandez v. City of Hartford*, 959 F. Supp. 125, 132 (D. Conn. 1997) (genuine issue of material fact existed as to whether employee's request to work at home two days a week was a reasonable accommodation); *Sargent v. Litton Systems, Inc*., 841 F. Supp. 956 (N.D. Cal. 1994) (job restructuring may include modification that would enable employee to work at home); *E.E.O.C. v. AIC Sec. Investigation, Ltd*., 820 F. Supp. 1060, 1064 (N.D. Ill. 1993) (fact issue existed as to whether employee's extensive absences rendered him unqualified in light of testimony that he spent good deal of time working at home; also noting that "[w]hether a phone call is made from the office, a car phone, or a home is immaterial."); EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, *supra* at Question 34; Work At Home/Telework as a Reasonable Accommodation (EEOC Oct. 27, 2005) *available at* http://www.eeoc.gov./facts/telework.html; Questions and Answers About Cancer in the Workplace and the Americans with Disabilities Act (ADA), at Question 11 (EEOC Aug. 3, 2005),

http://www.eeoc.gov/facts/cancer.html (employer should consider telework to accommodate engineer undergoing radiation for cancer); Questions and Answers: Promoting Employment of Individuals with Disabilities in the Federal Workforce, Exs. 10 and 11 EEOC), *available at* http://www.eeoc.gov/federal/qanda-employment-with-disabilities.cfm; EEOC Policy Letter, 5 NDLR ¶ 454 (March 31, 1994) (whether working at home is appropriate accommodation depends on whether it would be effective and whether it would result in undue hardship).

Likewise, the evidence in this case compels a finding that telework would have been a reasonable accommodation in this case, as shown at pp. 18–20 above. Defendant has a written policy permitting it, others did it, and the only proffered reason against it was attendance at meetings, but as likewise shown above, that simply was not required.[37]

### 4.    Flexible Interactive Process

The law requires a "flexible, interactive process" between the employer and employee to determine appropriate reasonable accommodations. 29 C.F.R. Pt. 1630 App., § 1630.9; *Taylor v. Principal Fin. Group.,* 93 F.3d 155, 165 (5th Cir. 1996), *cert denied,* 519 U.S. 1029 (1996) ("once an accommodation is properly

---

[37] Defendant also includes hearsay statements from the TWC, to which Plaintiff objects, suggesting that security issues may have been an obstacle.  But as is also shown above at pp. 18–20, security was not an obstacle, including for Plaintiff's own co-workers who had teleworked.

requested, the responsibility for fashioning a reasonable accommodation is shared between the employee and employer").

Plaintiff's initial request for accommodations triggered Defendant's obligation to engage in the flexible interactive process. *Taylor, supra,* 93 F.3d at 165. This Response is replete with evidence showing the Defendant's lack of good faith in engaging in that process. But it is the Defendant that claims that, as a matter of law, the Plaintiff failed to engage in good faith.

As reflected above, the Plaintiff made several different accommodation requests for a flexible morning schedule (pp. 16–17, 21, 25, 28, 29, 32, 37, 38, 39, 40, 41, 43) and for teleworking ( pp. 19, 25, 28, 29, 38, 39 – 40), and scores of inquiries about them, over the entire six months of her employment, from her orientation until the day she was fired. She spoke directly to at least *nine* different employees of Defendant about it, including her team lead (above at pp. 9, 16, 17, 19, 20, 26–27), her manager (above at pp. 14, 16, 20, 23, 32), her acting manager ( pp. 26–27), the company nurse (pp. 14, 15, 21, 22, 24, 28, 29, 30, 31, 34, 35, 38, 39, 40, 42, 44–45), her HR rep (pp. 22, 26, 28, 29, 31, 32, 34, 35, 39), the HR Director (pp. 28, 32, 34, 35), the HR Manager (pp. 26–27), the EEO Officer (pp. 32), and the Diversity Officer (pp. 31). She pursued it with everyone, and at every level, available to her. She provided at least six different medical releases (pp. 28–29, 34, 41) and numerous medical records, articles and x-rays (pp. 16, 30). She

had her doctor fill out multiple forms (pp. 22, 29) and speak to both the company doctor (pp. 42–43) and the company nurse (pp. 42).  She even asked her lawyer to meet with Defendant's counsel (pp. 31, 34).

The result?  None of it worked.

Ms. Blummer sought these accommodations, offered to others, in order to avoid missing work.  But Defendant refused them, and then disciplined her for missing work.  She asked to be able to work through lunch or stay late to catch up on her work, as others did, but this was refused her as well, and she was disciplined for doing so, and then disciplined for being behind in her work.

Instead of getting accommodations, she lost them—on the day she asked her lawyer to visit with the company about accommodations, Defendant took away the homemade footrest she had been using for years to alleviate her pain, threatened her with discipline if she tried to use it, and causing weeks of pain before replacing it (pp. 34).

Defendant blamed Ms. Blummer for not understanding their Byzantine accommodation system that their own staff did not understand.

In response to her requests for accommodations, Defendant first told her to fill out a FMLA request form with her doctor, knowing she was ineligible as a new employee (pp. 15). Weeks after she did so and turned it in, Defendant told her it was the wrong form (pp. 24–25).

Only after Ms. Blummer asked about the ADA did Defendant tell her to fill out a different form with her doctor, one containing a release-of-information clause, which she did. (*Id.*)   Defendant then required that she also sign an unnecessary,[38] blank release form authorizing access to any record, from any time period, and any provider, about any condition,[39] and then closed her file when she questioned it (pp. 30–31).   Defendant blamed her for its own delays, and sought even more release forms for other providers (pp. 41) with no intention of ever using them.

Defendant claimed it did not know what accommodations she was asking for, and in its Motion makes that claim still.   Yet the fact is that she repeatedly requested a flexible morning schedule and telework, documented both in writing, and Defendant's employees repeatedly admitted that they understood that.

Defendant blames Ms. Blummer for not pursuing teleworking more vigorously, when its own policy and its own manager said it was up to the manager (p. 9), and he told her that he would never approve it (p. 19).   It also blames Ms. Blummer for requesting a "totally" flexible schedule, but refused to allow her to

---

[38] Case law suggests that a simple doctor's form should suffice.  *See, e.g., E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 610–611 (5th Cir. 2009); *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 581 (S.D.N.Y. 2008) ("The fact that S & C insisted on a release that it may not have needed is not persuasive evidence of plaintiff's alleged failure to engage in the ADA's interactive process.").

[39] This is improper.  "In requesting documentation, employers should specify what types of information they are seeking regarding the disability, its functional limitations, and the need for reasonable accommodation. The individual can be asked to sign a *limited* release allowing the employer to submit a list of specific questions to the health care…professional."   EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, supra, at Question 6 (emphasis added).

correct it to make it more accurate (pp. 44–45).[40]   It also claims that she was

thrilled with this form, when she vehemently denies that.

Defendant claimed her work performance was poor, when all of it was

related to her accommodation needs, and the work she missed by Defendant's

delays and refusals.  It claimed she was insubordinate when what they meant was

that she had the gall to stay after five without permission to finish up work, just as

others did (p. 48).

Defendant knew that accommodations should be provided as soon as

possible, knew that she needed immediate accommodations to avoid more

absences and more discipline, and knew that speed was particularly required where

the lack of accommodation might result in discipline (pp. 11–12).   Yet it took

Defendant six months to act on her requests, which it did by denying them and

firing Ms. Blummer.[41]

It now argues all kinds of reasons for the termination, but it admitted that its

firing decision flowed from its decision to deny the accommodations (p. 48).   It

also admits that it did not fully consider all of the accommodations (pp. 46–48),

---

[40] Plaintiff's accommodation request was for a flexible morning start time to her work day with the ability to make up the morning time missed in the evening, and she notified Defendant of this request.  Ex. A (Blummer Aff. 5); Ex. H (Blummer Dep. 198:10-199:10, 173:8-16; 175:9-16; 302:4-7); Ex. H (Blummer Dep. Exh. 22 [USA 197]).  Although Defendant argues that Plaintiff's entire case is based on Plaintiff claiming that it would have been a reasonable accommodation for USA to allow her to come to work whenever her condition allows her to arrive, this is simply not the case.  Furthermore, Defendant has not articulated how accommodating Plaintiff's work schedule would be unreasonable given her position.

[41] Defendant asserts that "it is undisputed that USA granted every accommodation request that she made except her request for a totally flexible schedule."  This is simply not true.

and cannot say they would not have worked (p. 49). If an employer does not give the employee a chance to demonstrate that an accommodation would have worked, the plaintiff is entitled to a chance to prove it at trial. *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 317–318 (3d Cir. 1999); *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996); *Gibson v. Lafayette Manor, Inc.*, 2007 WL 951473, at *10 (W.D. Pa. March 27, 2007).

In sum, Defendant now blames Ms. Blummer for failing to engage in the flexible interactive process, even though it admitted that she was "very sincere, [and] she seemed like she was trying very hard to do what was needed," (p. 30) and even though Defendant's response to that sincerity and honest effort was to yell at her in accommodation meetings (p. 28).

Defendant crows about accommodations that it did choose to make, although they were minor, were often nothing more than what Defendant did for everyone (pp. 8, 33), did not address the real problems Ms. Blummer faced, and are not the subject of this suit.  Defendant cannot choose a few easy things to do, and then claim it is off the hook for the accommodation obligation.  Moreover, the duty to accommodate is a continuing one that is not necessarily exhausted by a single effort. *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 784 (6th Cir. 1998), *citing Criado v. IBM Corp.*, 145 F.3d 437, 445 (1st Cir. 1998); *McAlindin v. County of San Diego*, 192 F.3d 1226, 1237 (9th Cir. 1999); *Picinich*

*v. United Parcel Service*, 321 F. Supp. 2d 485, 516 (N.D.N.Y. 2004); *Shannon v. City of Philadelphia*, 1999 WL 1065210 (E.D. Pa. 1999); EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, supra, at Question 31.

The Defendant cannot have had any doubt about the accommodations being requested, but even if did, the employee is not required to request the exact accommodation ultimately sought. *E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 621–622 (5th Cir. 2009) ("Further, [plaintiff] was not required to come up with the solution … on her own. Under the ADA, once the employee presents a request for an accommodation, the employer is required to engage in the interactive process so that *together* they can determine what reasonable accommodations might be available.") (emphasis in original); EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, supra, at Question 5 ("individual with a disability does not have to be able to specify the precise accommodation"). Even an ambiguous request as to the precise nature of the disability or accommodation, if sufficient to notify the employer that the employee may have a disability that requires accommodation, requires the employer to ask for clarification. "[A]n employer cannot shield itself from liability by choosing not to follow up on an employee's

requests for assistance, or by intentionally remaining in the dark." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, (7th Cir. 2005).

Employers violate the law by delaying too long in offering accommodations. *Battle v. United Parcel Service, Inc.*, 438 F.3d 856, 863–884 (8th Cir. 2006); *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000), *judgment vacated on other grounds*, 535 U.S. 391 (2002); *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 312 (3d Cir. 1999). As the Fifth Circuit has observed, "[a]n employer that dragged its feet in that situation could force the employee to work under suboptimal conditions, 'simply document the employee's failures,' and use the employee's difficulties as an excuse to terminate her." *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 737 n.6 (5th Cir. 1999), *citing Taylor v. Phoenixville*, *supra*. And "[i]t is not an employee's responsibility … to repeatedly prod a reticent employer." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 808 (7th Cir. 2005).

In sum, Defendant has not demonstrated that as a matter of law Plaintiff is not a "qualified individual with a disability." The Court should thus deny Defendant's summary judgment motion on Plaintiff's discrimination claim.

## V. CONCLUSION

For the reasons cited above, and based on the evidence presented herein, the Defendant's Motion for Summary Judgment should be denied.

Respectfully submitted,


  /s/ Lucia Romano Ostrom
LUCIA ROMANO OSTROM
Attorney in Charge
Texas Bar No. 24033013
Southern Dist. of Texas No. 690123
ADVOCACY, INC.
1500 McGowen, Ste. 100
Houston, Texas 77004
(713) 974-7691 Phone
(713) 974-7695 Fax

BRIAN EAST
Texas Bar No. 06360800
ADVOCACY, INC.
7800 Shoal Creek Blvd., Ste. 171E
Austin, Texas78757
(512) 454-4816 Phone
(512) 454-3999 Fax

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 22, 2010, a true and correct copy of the foregoing document, in electronic form, was sent to the person listed below in accordance with the Local Rules for the U.S. District Court for the Southern District of Texas:

    Michael D. Mitchell
    Flyn L. Flesher
    Ogletree, Deakins, Nash, Smoak & Steward, P.C.
    One Allen Center
    500 Dallas Street, Suite 3000
    Houston, Texas 77002-4709


                                          /s/ Lucia Romano Ostrom
                                         Lucia Romano Ostrom